In the Matter of the Application of THE COMMISSIONERS of THE CENTRAL PARK, for and in behalf of THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK, relative to. laying a road or public drive between the northerly line of Fifty-ninth street and the southerly line of One Hundred and Fifty-fifth street, in said city.

The act of 1865, so far as it authorizes the *commissioners of. the Central Park,* instead. of the common council of the city of New York, to make an application to this court for the *opening of a road or public drive* above Fifty-ninth street, is *not unconstitutional,* whatever may be considered as to the validity of some other portions of that act.

The authority conferred on the commissioners to make such application is not that of any *local officer,* nor does it authorize them to discharge the duties of any *office,* but provides for the discharge of a mere ministerial act.

The common council of the city of New York never had authority, since 1807, to lay out any streets or public places in that part of the city which was embraced in the map of the commissioners filed under the act of 1807. Their power was below the limits embraced in that map.

The act of 1813 expressly limited their powers to that part of the city not laid out by virtue of the act of 1807. They had no authority to lay out or open any streets or public places but such as were provided for on the said map.

The authority conferred by the legislature upon the commissioners of the Central Park, to make application to lay out a road or public drive between the northerly line of Fifty-ninth street and the southerly line of One Hundred and Fifty-fifth street, did not in any way interfere with the authority previously bestowed upon the common council.

The legislature might have laid out this drive mentioned in the act, and having the power, they might authorize others to do it.

A mere error of judgment of the commissioners in the valuation of property taken for such purpose is not the subject of review on a motion to confirm their report, unless the sum allowed was grossly inadequate and unequal as compared with other valuations, or unless some wrong principle was adopted as to the amount allowed.

This act of 1865 does not authorize the taking of any land by the commissioners not required for the drive or road, which the act provides shall be of an uniform width, and is described in the notice required to be given by the commissioners as follows: " Said road or public drive is of a general width of one hundred and fifty feet, as snown on a certain map," &c.

*Held,* therefore, that the commissioners had no jurisdiction to take gores of land outside of said road or drive, and so far as such gores are included in there proceedings, they are erroneously taken.

*First Judicial District, June,* 1868.

Hon. GEORGE G. BARNARD, *P. J.; Hon.* JOSIAH SUTHER-LAAD, *Hon.* DANIEL P. INGRAHAM, *Justices.*

MOTION to confirm the report of the commissioners appointed to acquire land for the widening and laying out of the Bloomingdale road, or Broadway, between Fifty-ninth and One Hundred and Fifty-fifth streets, in the city of New York, the road to be of a general width of one hundred and fifty feet. ·

RICHARD O'GORMAN, *corporation counsel, and*
WILLIAM FULLERTON, *for the motion.*

ABRAHAM R. LAWRENCE, JR., *for the objector Rudolph A. Witthaus,* presented the following points, in opposition to the confirmation:

*First.* The act of April 24, 1865, entitled "An act to provide for the laying out and improving of certain portions of the city and county of New York," under which the proceedings herein were initiated, and the commissioners of estimate and assessment herein were appointed, is in conflict with the second section of the tenth article of the constitution of this state, because it takes away from the mayor, aldermen and commonalty of the city of New York, and the officers of said corporation, the power of determining the location, width and extent of a public road or drive in said city, and of the other streets, roads, squares and places in said act mentioned, and of laying out the same, and of acquiring title thereto, and transfers the same to the commissioners of the Central Park, which said commissioners are officers who are not elected by the electors of the said city or county, nor appointed by the authorities thereof. (*Laws of 1865, p.* 1136. *See, as to the appointment of the Central Park Commissioners, Laws of 1857, vol.* 2, *p.* 715; *Laws of* 1859, *p.* 857 ; *Laws of* 1861, *p.* 164; *Laws of* 1866, *vol.* 1, *p.* 822, § 8.)

(*a.*) The second section of the tenth article of the constitution reads as follows :

" § 2. All county officers whose election or appointment is not provided for by this constitution shall be elected by the electors of the respective counties, or appointed by the boards of supervisors or other county authorities, as the legislature shall direct.

" All city, town and village officers, whose election or appointment is not provided for by this constitution, *shall be elected by the electors of such cities, towns and villages,* or of some division thereof, *or appointed by such authorities thereof as the legislature shall designate for that purpose.*

"All other officers whose election or appointment is not provided for by this constitution, and all officers whose offices may hereafter be created by law, *shall be elected by the people or appointed as the legislature may direct.*"

(*b.*) It was decided in the case of *The People ex rel. Wood* agt. *Draper* (15 *N. Y. R.* 532). that the above section, so far as it limits the power of appointment, or the elec-

Matter of Commissioners of Central Park.

tion of city or county officers to the authorities of the city or county, or to the electors thereof, only applied to city and county officers in existence at the time of the adoption of the constitution of 1846.

But it was also held in that case that it was not enough to take a case out of the provisions of the above section that the *names of officers existing when the constitution was adopted, were afterwards changed by an act of the legislature, or their functions colorably modified.* That the constitution regarded substance not form. (*Per* DENIO, *C. J.* 539; *See also People* agt. *Raymond, Ms.*)

(*c.*) This objector insists that the powers and duties which, by the act of 1865, before referred to, are sought to be vested in the commissioners of the Central Park were, at the time of the adoption of the constitution of 1846, confided to the mayor, aldermen and commonalty of the city of New York, and to the officers of said corporation.

The 177th section of the act of April 9, 1813, entitled "an act to reduce several laws relating particularly to the city of New York into one act," after providing that the mayor, aldermen and commonalty may take proceedings to have the streets, roads, &c., opened, *which were laid out by the commissioners of streets and roads, appointed under the act of* 1807, goes on to provide as follows:

"And whenever and as often as it shall, in the opinion of the said mayor, aldermen and commonalty, in common council convened, be necessary or desirable for the public convenience or health, *to lay out, form and open any street or streets or public place or places in any part of the said city not laid out into streets, squares and public places by the commissioners of streets and roads in the city of New York, under and by virtue of the act aforesaid,* or to extend, enlarge, straighten, alter, or otherwise improve any street or streets, or part of a street, or public place or places already laid out or hereafter to be laid out and formed or opened in any part of the said city not laid out into streets, avenues, squares and public places by the commissioners aforesaid, *it shall be lawful for the said mayor, aldermen and commonalty of the city of New York to order and direct the same to be done, and to cause the same to be done accordingly in such manner as they shall think most advisable."* (*See Act of* 1813, § 177; *Davies' Laws,* 528; *See also Davies' Laws,* 534.)

This objector contends that the transfer of these powers to the commissioners of the Central Park, under the construction given by the court of appeals, in the case of the *People* agt. *Draper* (*supra*), and in other cases which have followed that case, to the section of the constitution above referred to, is not within the powers of the legislature.

He does not deny that it would be competent for the legislature to transfer the powers in question to other officers than the mayor, aldermen and commonalty of the city of New York, but insists that the officers to whom such transfer is made, must be either elected by the electors of the city or appointed by the local authorities.

The powers sought to be given to the commissioners of the Central Park were, prior to 1846, exercised solely by local officers, and the case falls precisely within the provisions of the constitution relative to local officers. (*People* agt. *Draper,* 15 *N. Y. R.* 532; *People* agt. *Raymond, Court of Appeals, March Term.*)

*Second.* Even assuming that the legislature had the constitutional power to confer upon the commissioners of the Central Park the authority given to said commissioners by the act of 1865, the objector contends that the said commissioners had no right, *in this proceeding,* to take the property belonging to him, which is shown upon the diagram annexed to the objections filed by him.

(*a.*) It will be perceived, by reference to the first section of the act of 1865, that the powers of the commissioners of the Central Park, as to laying out "*public squares and places,*" are limited to that part of the city of New York which is north-

ward of the southerly line of One Hundred and Fifty-fifth street. Below One Hundred and Fifty-fifth street, they have power, under that act, to lay out a road or drive, not a public square or place. Now, the triangular piece of property belonging to the objector in no just sense can be said to be a part of the road or drive laid out by the commissioners.

It will be a public place, but not a road or drive.

Although, then, the commissioners may have since acquired the right to acquire lands for public places, this proceeding being based on the act of 1865, and taken *for the opening of the road mentioned in that act,* the powers of the commissioners must be determined by that act.

If it should be said that under the act of 1865, the commissioners have a discretionary power to determine the location, width, courses, windings and grades of such road, &c., the answer is, that it must clearly appear that there has been something like a reasonable exercise of that power; and that, under the pretence of laying out a road or drive, the laying out of squares and public places cannot be accomplished. The two powers are distinct and separate. (*Laws of* 1865, 1136; *Sharp* agt. *Spier,* 4 *Hill,* 76; *Sharp* agt. *Johnson,* 4 *Hill,* 92.)

*Third.* Under the provisions of the first section of the act entitled "an act to prevent fraud in the opening and laying out of streets and avenues in the city of New York," passed April 24, 1862, the commissioners of estimate and assessment are required to complete their proceednigs within four months from the time of their appointment, unless further time is allowed for that purpose by the supreme court. (*Laws of* 1862, 967; *Laws of* 1865, 1138.)

*Fourth.* The award made by the commissioners of estimate and assessment for the property of this objector is grossly inadequate, and far below the actual value of the same.

(*a.*) The affidavits presented on the part of the objector make it quite apparent that the sum of $24,000, the amount finally allowed by the commissioners for the property in question, does not approximate to the value of such property.

These affidavits are seven in number, and are made by men who have had the amplest experience in sales of real estate in and about the vicinity of the property in question, and, in fact, all over New York.

1st. Mr. Loomis, who is, and who for the last fifteen years past has been, an agent and broker engaged in the business of negotiating the sale and purchase of real estate, both in the vicinity of this property and elsewhere in the city, places the value of the same at $60,000, or $36,000 more than has been allowed by the commissioners.

2d. Mr. Kendall, who has been engaged for twenty years past in the business of negotiating the sale and purchase of real estate in every part and section of the city, and who is well acquainted with the property of the objector, values it at $50,000.

3d. Mr. John McClave, a very well known real estate man, values the property at $50,000.

4th. Mr. James M. Miller, for thirty-six years past an auctioneer of real estate in this city, a man of the greatest possible experience in such matters, who is well acquainted with the property, values it at $50,000.

5th. Mr. William H. Raynor, who has been a real estate broker in this city for twenty-five years, values the property at $45,000.

6th. Mr. Daniel F. Tiemann, a resident of the city for upwards of sixty years, and who is very familiar with the value of real estate in the upper part of the Island of New York, values the property at $45,000.

7th. Mr. William R. Stewart, a resident of the city for upwards of thirty years, values the property at $45,000.

Matter of Commissioners of Central Park.

8th. There is also the objector's own affidavit attached to the objections, that the property is worth at least $60,000; but, as he is interested, under the rule applicable in these cases, his affidavit cannot probably be taken into consideration as regards value.

*Fifth.* The commissioners have, however, awarded to the objector $21,000 *less than the lowest valuation specified in any of the above affidavits.*

The objector submits that with such affidavits before the court, he brings his case within the rule allowing the court to send back a report when it is strongly against the weight of evidence.

It is not of course known to the objector, nor can it be until this case is actually argued, whether any, and if so, what, or how many affidavits will be presented by the commissioners to sustain their report; but he confidently submits that whether such affidavits are few or numerous, the experience, character and reputation of the men who have made affidavits in support of his objections, justifies him in asking the court to weigh well those affidavits, and not to sustain the commissioners in awarding him a sum which is but little more than one-half of the lowest amount specified in those affidavits as the value of his land.

*Sixth.* But the commissioners have erred in the principle upon which they have acted in arriving at the value of the objector's land; and on that ground he asks that the report may be sent back to them.

Their error consists in this : They have not taken into account the fact that the land of the objector is all front, and have allowed to him no more per square foot than they have awarded for other lands having only one or two fronts.

For the piece of land on the north-westerly corner of Broadway and Seventy-second street, containing only 2,100 square feet, and with only a front on Seventy-second street and Broadway, they have allowed $14,049, or at the rate of $6.70 per square foot, while for the property of the objector they have allowed but $24,000, or less than $6 per square foot.

For the piece of land on the south-westerly corner of Seventy-second street and Broadway, containing 1,840 square feet, the commissioners have allowed $12,649, or at the rate of $6.90 per square foot.

For the piece of land on the north-east corner of Seventy-first street and Tenth avenue, containing 1,930 square feet, the commissioners have allowed $14,087, or at the rate of $7.30 per square foot.

For the piece of land on the south-east corner of Sixtieth street and Broadway, containing 1,600 square feet, the commissioners have allowed $20,000, or at the rate of $12.50 per square foot.

For the piece of land on the south-west corner of Sixtieth street and Broadway, containing 2,3000 square feet, $33,000, or at the rate of $14.35 per square foot.

To the objector, whose piece of land contains 4,150 square feet and fronts on Broadway, the Tenth avenue, and Seventy-third street, and runs to a point facing Seventy-second street, with three full fronts (and it may be said, including the point near Seventy-second street, with four fronts), the commissioners have actually awarded less per foot than to the owners of the property above specified.

There certainly can be no principle upon which this discrimination is made against the objector.

For any error in the principle of valuations it is well settled that the report of the commissioners will be recommitted to them. (*Matter of Furman Street,* 17 *Wend.* 650.)

*Seventh.* The commissioners, in making their award to the objector, have evidently overlooked the fact that the entire property of the objector is taken for the proposed improvement, and that no residue is left to him to be benefitted by the improvement.

The owners of the parcels above referred to, who have received greater proportionate awards than the objector, have a residuum remaining which is much enhanced in value. Yet no allowance has been made for this fact by the commissioners.

*Eighth.* Again, the taking away of the objector's property has proportionately increased the value of the adjacent lots on the Tenth avenue, and it is submitted that a portion of that increase should be credited to the objector in making his award.

*Ninth.* The objector, in conclusion, does not deny the well settled principle that the determination of the commissioners is entitled to great weight upon a mere question of value; but he confidently insists that, where the difference between the valuation of the commissioners and of the witnesses for the owner is so great, he is entitled to the benefit of every doubt which the court may have as to the justice of the award. He does insist that it is clear that in this case there has been an error in principle committed by the commissioners in making the award to him; and he therefore asks that the report made be remitted to the commissioners, for the purpose of revision and correction.

IRA SHAFER, *for objectors Campion, Clark* and *Grove,* relied upon the constitutional points presented by the counsel for Witthaus, and objected to the awards. made by the commissioners as inadequate.

Mr. O'GORMAN, in reply to the contestants:

I. As to the objections of Rudolph A. Witthaus:

(*a.*) It is objected that the act of April 24, 1865 (*ch.* 565 *Laws* 1865), under which these proceedings have been brought, violates section 2, article 10, of the constitution of this state.

This question was raised and determined in *The Matter of the Central Park,* reported 16 *Abb. Pr. R.* 56.

In that case and the case at bar the objection was the same, urged by the same counsel, and overruled by Judge INGRAHAM, who now occupies a seat at the general term. (*See points of counsel and opinion of court,* 16 *Abb.* 56.)

II. The duties devolving on the commissioners of the Central Park, under chapter 565, laws 1865, never did devolve on the mayor, aldermen and commonalty of the city of New York, under the laws of 9th April, 1813, and were not imposed on them at the time of the adoption of the constitution of 1846.

The 177th section of that act, cited by counsel for Witthaus, empowers the mayor, &c., to open streets which *had been laid out* by the commissioners appointed under the act of 1807, and also to *lay out* and open any street or public place in any part of the city *not* laid out in streets, &c., under said act of 1807.

But there is no part of the city above Fourth street which was not laid out in streets, etc., by said commissioners under said act; and, therefore, as to all that region, including the locality affected by the proceedings which are now before the court, the mayor, etc., had acquired no powers and assumed no duties by virtue of the act of 1813, save that of applying to the supreme court for the appointment of commissioners to open streets already laid out. But as to *laying out* a new street or public place in the said district, they had no power whatever.

Whenever, therefore, it has seemed expedient to *lay out or open a new street* in that

part of the city, it has become necessary to apply to the legislature for power to do so.

This course was adopted in the case of Madison avenue, which, not having been laid out by the commissioners under the act of 1807, was laid out and opened by virtue of act of the legislature. (*Chapter* 466 *Laws of* 1860.)

The same course was adopted as to the extension of Fifty-fourth, Fifty-fifth and Fifty-sixth streets. (*Chapter* 73 *Laws of* 1857.)

1. Also in the proceedings under the act of 1853, to take the park itself. (*Laws of* 1853, *p.* 1167.)

2. In the proceedings confirmed by the court in taking the land from One Hundred and Sixth to One Hundred and Tenth street for the extension of the park.

3. In the widening of Seventh avenue, under the act of 1864. (*Laws* of 1864, *p.* 637.)

4. In the widening of Sixth avenue, under the act of 1865. (*Laws of* 1865, *p.* 113.)

5. In the acquisition of lands by the Croton aqueduct board. (*Laws of* 1849, *p.* 540, § 14.)

6. In the acquisition of lands by the Croton aqueduct board, in behalf of the mayor, aldermen and commonalty, for a new reservoir. (*Laws of* 1853, *p.* 961.)

7. In the acquisition of lands by the Croton aqueduct board in Westchester county, etc. (*Laws of* 1865, *p.* 446.)

8. In the acquisition of lands by the Croton aqueduct board for a reservoir at High Bridge.

In at least six of the above cases, proceedings instituted under exactly the same circumstances, and under laws precisely similar to the one under which the present proceedings are instituted, have been confirmed by this court, and at least three of these have been confirmed at general term.

The same course has been adopted in the case at bar, the Boulevard, &c., authority for laying out which is derived from a special act of the legislature, under which these proceedings have been instituted, and without which the mayor, &c. would have been utterly powerless.

The cases cited by the counsel for Witthaus, therefore, sustaining the proposition that the legislature cannot devolve on officers not elected by the people, or appointed by the local authorities, &c. power to discharge duties theretofore discharged by the mayor, &c., are not in point.

The powers given to the Central Park commissioners by the act of 1865 were not prior to 1846 exercised by local officers.

In further development of this view, the following more detailed statement of the proceedings heretofore had in these matters is submitted to the court.

The power of laying out and opening streets is not a power of such nature that the legislature cannot transfer it; it is not one of the ordinary functions of municipal government.

The legislature has continuously, for more than a century, passed laws directing the manner of laying out streets and roads, and of permitting the common council to do it. Among them may be cited: *Acts of* 1741, *ch.* 712; 1751, *Nov.* 25; 1754, *May* 4; 1764, *Oct.* 20; 1774, *March* 9; 1787, *ch.* 61; 1807, *ch.* 115; 1814, *ch.* 175; 1815, *ch.* 151; 1816, *ch.* 28; 1821, *ch.* 10; 1826, *ch.* 166; 1827, *ch.* 268; 1828, *ch.* 149; 1828, *ch.* 264; 1829, *ch.* 267; 1829, *ch.* 269; 1830, *ch.* 8; 1831, *ch.* 59; 1831, *ch.* 252; 1832, *ch.* 89; 1832, *ch.* 101; 1833, *ch.* 49; 1833, *ch.* 98; 1833, *ch.* 230; 1833, *ch.* 309; 1834, *ch.* 174; 1834, *ch.* 309; 1835, *ch.* 46; 1835, *ch.* 268; 1836, *ch.* 251; 1836, *ch.* 280; 1836, *ch.* 279; 1836, *ch.* 282; 1836, *ch.* 361; 1837, *ch.* 177; 1837, *ch.* 182; 1837, *ch.* 274; 1838, *ch.* 148; 1838, *ch.* 140; 1838, *ch.* 223; 1843, *ch.* 53; 1846, *ch.* 268; 1845, *ch.* 314; 1845, *ch.* 146; 1847, *ch.* 439; 1847, *ch.* 219; 1847, *ch.* 203; 1847, *ch.* 138; 1847, *ch.* 38; 1850, *ch.*

65; 1851, ch. 183; 1851, ch. 443; 1852, ch. 285; 1857, ch. 63; 1857, ch. 388; 1857, ch 785; 1859, ch. 363; 1860, ch. 201; 1860, ch. 366; 1860, ch. 466; 1860, ch. 486; 1862, ch. 176.

· These include streets in the part of the city not laid out by the commissioners of 1807, as well as that part laid out by them, north of say Fourth street.

Among these acts are those laying out Hudson street from Greenwich lane to Ninth avenue, Fifth avenue from Twenty-third to Thirty-first street, Twenty fourth, Twenty-fifth, Twenty-sixth, Twenty-seventh, Twenty-eighth, Twenty-ninth and Thirtieth streets, from Fourth avenue to Sixth avenue; Stuyvesant street, from Bowery road to Second avenue; Irving place and Lexington avenue; Madison avenue, the Bloomingdale road or Broadway, from Twenty-first street to Eighty sixth street; Wooster street, or University place, from Eighth street to Fourteenth street; Manhattan and Lawrence streets, Fourth avenue (widening), Union place, Tompkins square, Madison square, Mount Morris square.

It is true, as stated by the objector, that section one hundred and seventy-seven of chapter eighty-six of revised laws of 1813 gives power to the mayor, aldermen and commonalty of the city of New York, whenever and as often as it shall, in their opinion, "be necessary or desirable for the public convenience or health, to lay out, form and open any street or streets, or public place or places, in any part of the said city not laid out into streets, avenues, squares and public places, by the commissioners of streets and roads, in the city of New York, under and by virtue of the act aforesaid." (Act of April 3d, 1807.) "To extend, enlarge, straighten, alter or otherwise improve any street or streets, or part of a street, or public place or places, already laid out or hereafter to be laid out, and formed or opened, in any part of the city not laid out into streets, avenues, squares and public places by the commissioners aforesaid." But the previous portion of the same section, which is not quoted by the objector, clearly shows that in the part land out by such commissioners, the mayor, aldermen, &c., had no such power.

The common council has never assumed to lay out, extend, enlarge, straighten or alter any street, avenue, square or public place, above or north of say Fourth street, since the passage of the act of 1807, except under special legislative authority first obtained therefor. It is believed that no exception exists to this rule.

The action of the common council from the year 1807 to the present time, so far as laying out streets, avenues, &c., above, say Fourth street, has been consistent with the 8th section of act of April 3d, 1807, which declares "That the plans and surveys of the said commissioners, or any two of them, in respect to the laying out of streets and roads within the boundaries aforesaid," "shall be final and conclusive, as well in respect to the said mayor, aldermen and commonalty as in respect to the owners and occupants of lands, tenements and hereditaments, within the boundaries aforesaid; and in respect to all other persons whomsoever."

So completely has the common council not only regarded itself, but also, so completely has it been without power or authority to lay out streets, avenues, squares or public places, within the boundaries laid out under the act of 1807, that in the case of the present Tompkins Market and Hall street adjoining it, and extending from Sixth to Seventh street, although the Corporation owned the land in fee simple, they did not attempt to lay out the street until the act authorizing it to be done had been obtained. (See chap. 267 Laws of 1829.)

So also in relation to Stuyvesant square and Rutherford and Livingston places, although the cession of the land for the whole improvement was offered, they declined to accept it until an act was passed authorizing the laying out of the square and the streets. (See chap. 361 Laws of 1836.)

The road or public drive now in controversy is between Fifty-ninth street and One

Matter of Commissioners of Central Park.

Hundred and Fifty-fifth street, and wholly within that part of the city which *was* most regularly and thoroughly laid out into streets and avenues by the commissioners appointed by and acting under the act of April 3d, 1807.

The legislature has in frequent cases authorized and directed certain persons to lay out streets, roads, avenues, squares and public places in the city of New York, and declared that they should have exclusive power to do so, and that the plans and surveys made by them should be final and conclusive.

The act of April 3d, 1807, which was passed at the request of the mayor, aldermen and commonalty, appointed Simeon De Witt and others to lay out all the city north of say Fourth street, of the city of New York, and provided that the plans so made "should be final and conclusive against the mayor," &c. (*See Minutes of Common Council, Feb. 16th, 1807.*)

Chapter 103 of laws of 1809 appointed Simeon De Witt and others to lay out Canal street, in the city of New York, and declared their plan should be final and conclusive.

Chapter 201 of laws of 1860 appointed James C. Willett and others commissioners to lay out that part of the city north of One Hundred and Fifty-fifth street, and to make alterations below One Hundred and Fifty-fifth street, and gave them exclusive power to do so, and declared that their plans should be final and conclusive.

By act of 1865, chapter 565; act of 1866, chapter 367 ; act of 1867, chapter 697 ; the commissioners of the Central Park have been empowered and directed to lay out streets, avenues, roads, public squares and places, in all the part of the city north of Fifty-ninth street and west of Eighth avenue, and also within a space three hundred and fifty feet in width surrounding the Central Park, as well as to lay out the avenue St. Nicholas, and extend and widen Manhattan street; and all these acts declare that the maps, plans and surveys made shall be final and conclusive.

The legislature has often authorized boards or persons to acquire title to lands required for public purposes, in the name and on the behalf of the mayor, aldermen and commonalty of the city of New York.

The following are some of the cases in which this has been done:

Chapter 103, laws of 1899, appointed Simeon De Witt and others to take the lands required to make Canal street.

Chapter 256 of laws of 1834 authorized the water commissioners for the city of New York to acquire title to land required for the Croton aqueduct; and chapter 328 of 1837 conferred similar powers on them in relation to alterations in the route of the Croton turnpike.

The Croton aqueduct board, by chapter 383 of laws of 1849, chapter 501 of laws of 1853, chapter 449 of laws of 1870, chapter 265 of laws of 1865, were authorized, for and in behalf and in the name of the mayor, &c., to take possession of and use, and acquire title to, land, real estate and property required for laying mains, constructing reservoirs, gate houses, &c.

The board of commissioners of the Central Park, by chapter 101 of laws of 1859, chapter 564 of laws of 1865, chapter 565 of laws of 1865, chapter 367 of laws of 1866, chapter 757 of laws of 1866, chapter 697 of laws of 1867, are authorized, empowered and directed, for and in the behalf and in the name of the mayor, aldermen, &c., to take proceedings to acquire title to the lands required for the extension of the Central Park, the lands required for the streets, roads, public squares and places laid out by them under several laws ; also for the widening and opening of Sixth avenue, the avenue St. Nicholas and Manhattan street, as also all streets and avenues laid out under act of April 3d, 1807, north of Fifty-ninth street.

More than twenty miles of streets have been laid out under the act in question, and still more under other similar acts. Inextricable confusion will be created in relation

to purchases and sales of real estate, made by individuals on the lines of such streets during the past two years, if the proceedings had in full faith of the validity of the laws are not sustained.

These miles of streets are not, it will be recollected, laid out through farm lands, but through city lots, whose value is estimated by the square foot rather than by the acre. Are these layings out to such an immense extent to be disturbed, and the numberless small ownerships fronting on them to be depreciated in value, and deprived of access, *in order that one objector may get a sum for his lands greater than that awarded him by intelligent disinterested sworn valuators?*

III. The court will remember that the streets of the city of New York are not the property of the corporation, as such, but, after the land for them is acquired, they are held in trust for the whole people of the state. (*See People* agt. *Kerr.*)

The legislature has from time immemorial delegated the power to acquire property by *eminent domain* to *corporations, e. g.*, railroad corporations, turnpike companies; to *quasi corporations, e. g.*, boards of supervisors; to *officers by title of office, e. g.* the corporation counsel, by act of 1853, and the Croton board and the Central Park by various acts before cited; and to individuals, as in the case of Canal street.

This power is exercised, not in the interest of the corporation alone, but of the whole people of the state, in trust for whom the property, when acquired, will be held.

The motion is made to confirm the report in the name of the mayor, aldermen and commonalty, by their law officer, the counsel to the corporation, who is especially directed by law to do so, and no objection is presented by the mayor, aldermen and commonalty.

IV. There is no distinction between the powers of the Central Park commissioners, as to *streets* and *public places*, under the act of 1865 (*ch.* 565, *p.* 1136). Section 1 in terms covers "streets, roads and public places;" and the court having determined, in 16 *Abbott*, that the power given to the commissioners to open the Central Park was constitutional, the decision applies with equal force to "roads and streets."

V. The court will take judicial notice that all the city north of Fourth street, within the limits affected by this proceeding, was laid out in streets and avenues by the commissioners appointed under the act of 1807; otherwise affidavits to that effect can be supplied.

VI. The objection that the wedge of land owned by the objector Witthaus cannot be necessary for "a road or drive," but if taken in this proceeding would form a "public place," is without force.

Under section 1 of the act of 1865, the commissioners of the Central Park are empowered "to determine the location, *width,* courses, &c., of said road, and may widen Bloomingdale road," &c.

They have exercised that power in this case. and the road so widened includes the lots of the objector.

It is to be presumed that in so doing they have exercised a reasonable discretion, the opinion of the objector to the contrary notwithstanding. There is nothing in the act requiring the road to be of a uniform width; it may be of varying width.

VII. As to the objection that the commissioners should have completed their report in four months from the time of their appointment, the answer is simple.

*First.* This proceeding is under a special act of the legislature of 1865, providing a new and independent scheme for laying ont streets, and is not governed by the provisions of the former act of 1862, which is quoted to sustain this objection. The act of 1862 refers only to the altering or opening of streets or avenues *then* existing.

*Second.* Even if it were otherwise, it is in the discretion of the court to allow further time, and they can do so now, if they think proper.

VIII. A suggestion from the court deserves attention. The notice and petition in this matter refer to map filed in the park commissioners' office, and accessible to all, also filed in the register's office and office of the secretary of state.

The petition refers to the same map, and a copy of the map is annexed.

This reference sufficiently designates the space, title to which was to be acquired in the proceeding, and no one interested could be misled thereby.

IX. It is submitted to the court that the time for making objections to the authority of the commissioners of assessment, etc., in this matter, has gone by.

The counsel to the corporation, on behalf of the mayor, etc., and in obedience to the law of 1865, made application to the supreme court for the appointment of commissioners.

Ample notice to all parties owning property to be affected by this matter was given, by publication thereof in certain newspapers, according to law.

No objection was made on the part of Mr. Witthaus to that application, and the commissioners herein were thereupon appointed.

In the performance of their duties they adjudicated upon the claims of Mr. Witthaus.

These claims were presented by him to them, without any objection on his part as to their authority to pass upon the same.

He now, by his counsel, appears before the general term, which holds in these matters the position of an appellate court, and presents to it a plea to the authority of the inferior tribunal before which he has voluntarily and without any objection discussed his claim.

This course is in violation of all principles of sound logic. " *Consensus tollit errorem.*" (*Broom's Legal Maxims.*)

X. The commissioners of estimate and assessment were appointed to examine and decide such questions, to hear evidence, view the land, and ascertain all the facts and opinions which could throw a light on the subject.

They have done so and decided.

Again, on receipt of the written objections of Witthaus, they further discussed the matter, and raised his award as far as they deemed it expedient to do.

This court, sitting at general term, cannot possibly reverse their decision without a thorough examination of all the grounds on which it was formed, without, in fact, doing all, hearing all, seeing all, that the commissioners have done, heard and seen.

The affidavits of the objector and his friends do not agree with one another.

One values the property at sixty thousand dollars; another forty-five thousand dollars.

All these values are merely speculative.

The affidavits produced by the commissioners are more likely to be disinterested and reliable.

But the whole subject is out of the reach of the court.

No error of law has been committed by the commissioners, and the court cannot review their decision on a mere question of fact.

XI. But even were it proper for the court to reverse the action of the commissioners in making the awards complained of, it can be satisfactorily shown that the objections to the awards are unreasonable and unjust.

As to the objections four, five and six, that the award to the objector Witthaus is inadequate, and a violation of the principle which should have governed the commissioners, counsel submits the following remarks and statements:

The true way to regard the award so as to judge whether all the elements of value

of the land taken have been considered, is to compare the award for it with the award for land similar in other respects in the same neighborhood.

The award for objector's land No. 45, contents, 4,350 sup. feet; per sup. foot,. $5.62 ............................................................ $24,000

The award for three lots, northwest corner of Seventy-third street and Broadway, diagonally opposite to objector's piece, Nos. 63 and 64, contents 5,636 sup. feet; per sup. foot, $3.80 .......................... 21,500

At this rate the objector's award would have been, 4,280 sup. feet, at $3.80 per sup. foot ...................................................... 14,550

At the rate for Mr. Witthaus' award, that Nos. 63 and 64 would be 5,636 sup. feet, at $5.62 ................................................... 31,683

Comparing Mr. Witthaus' award with the award for parcel on the southwest corner of Broadway and Seventy-first street, opposite to this land:

Award for Nos. 61, 60, 59, 58, contents, 5,890 sup. feet; per foot, $3.87 .... $22,700

At this rate, objector's award would have been 4,250 sup. feet, at $2.87 per foot ....................................................................... 12,197

At the rate of objector's award, that for Nos. 61, 60, 59, 58, would have been, 5,890 sup. feet, at $5.62 per foot ................................ 33,110

Comparing Mr. Witthaus' award with the award for the whole front on Broadway, between Seventy-second and Seventy-third streets, and opposite his land, to wit.:

Nos. 54, 55, 56, 57, 58, 59, 60 ............................................ $58,385

Contents, 15,780 sup. feet, or $3.66 per foot.

At this rate the objector's award would have been, 4,520 sup. feet, at $3.66 per foot ...................................................................... 16,545

At the rate of objector's award, that for Nos. 54, 55. 56, 57, 58, 59, 60 and 61, 15,780 sup. feet, at $5.62 per foot .................................... 88,234

And this last parcel of eight lots includes the northwest corner of Seventy-second street, a hundred foot street.

Comparing Mr. Witthaus' award with the award of an outside lot, one with only one front on the above block, and opposite to his lots, to wit.:

No. 59 ...................................................................... $6,155

Contents, 1,955 sup. feet, or $3.15 per foot.

At this rate the objector's would have been, 4,250 sup. feet, at $3.15 per foot ...................................................................... 13,387

At the rate of objector's award, that for No. 59 would have been, 1,955 superficial feet, at $5.62 per foot ........................................ 10,987

These comparisons are ample to show, first, that Mr. Witthaus received an award much more than land in his immediate neighborhood; and as the only cause urged for the greater value claimed for his land is that it has three fronts, it is conclusive that the commissioners did take into account that element, and whatever other elements of value existed.

As to the piece of Mr. Groves, being the block between Sixty-fifth and Sixty-sixth streets and Broadway and Ninth avenue, No. 24, award.... $90,000

Area, 17,185 superficial feet; award per foot, $5.20.

Compared with award on lots northeast corner of Sixty-sixth street and Broadway, Nos. 25, 26 and 27, award.................................... 35,191

Area, superficial feet, 83,300; award per foot, $4.10.

At this rate, Mr. Groves would receive for his plot (17,195 superficial feet, at $4.10 per foot)......................................................... 70,358

At the rate of Groves', Nos. 25, 26 and 27 would receive, for 8,430 superficial feet, at $5.20 per foot............................................... 43,836

And this with an average of nearly ten feet of rock on Mr. Groves' piece.

As to objection of Mr. Campion for about four lots on northeast corner of Broadway and Sixty-first street, being half the block on Broadway, and eighty-six feet nine inches in depth:

He receives ........................................................... $51,500

The next plot on the same block, same size, southeast corner of Broadway and Sixty-second street, receives.................................... 43,836

The next plot, on the northeast corner of Sixty-second street, same size as Mr. Campion's...................................................... 39,520

The mortgage referred to, as estimate of property, covers more lots than those taken.

XII. For the above reasons, it is submitted that no error in law or fact has been committed in these proceedings, and that the report of the commissioners should be in all respects confirmed.

## Mr. LAWRENCE in reply to the points of the commissioners of the Central Park:

*First.* It having been asserted by one of the counsel moving for the confirmation of the report in this matter, that the mayor, aldermen and commonalty of the city of New York, and their officers, never had the power which is sought to be conferred upon the Central Park commissioners by the act of April 24, 1865, and under which this proceeding is taken, it becomes important to state their powers more fully than was done upon the points heretofore presented by the objector.

*A.* And first we say, that the mayor, aldermen and commonalty were vested with such powers by the Montgomerie charter.

The sixteenth section of the Montgomerie charter, provides as folows:

" *And we do further*, for us, our heirs and successors, give, grant, ratify and confirm unto the said mayor, aldermen and commonalty of the city of New York, and their successors forever, that the common council of the said city, for the time being, or the major part of them, and from time to time, and at all times hereafter forever, shall have full power; license and authority, not only to estabiish, appoint, order and direct the making and laying out of all other streets, lanes, alleys, highways, watercourses and bridges, not already made or laid out, but also the altering, amending and repairing all such streets, lanes, alleys, highways, watercourses and bridges, heretofore made or laid out, or hereafter to be made or laid out, in and throughout the said city of New York, and the Island of Manhattan's, in such manner as the said common council, for the time being, or the major part of them, shall think or judge to be necessary and convenient for all inhabitants and travelers there."

There could not be a broader or more comprehensive grant of power, in reference to streets and highways in any and every part of the Island of Manhattan, than is contained in the foregoing section.

*B.* In the next place we say, that the design of the legislature evidently was, by the act of 1813, to provide a general scheme for the laying out of streets, avenues, &c., in the city of New York, and to confer upon the mayor, &c., and their officers full power and authority to take all proceedings which might be necessary for the acquisition of the title to the lands required for such purpose, and for the subsequent improvement, regulation, grading, paving and repairing of the same.

As only a portion of the 177th section of that act is set forth in the points used on the argument, it is here given entire:

" CLXXVII. *And be it further enacted,* that whenever and as often as the mayor, aldermen and commonalty of the city of New York, shall be desirous to open any street, avenue, square or public place, or any particular part or section of any street or avenue laid out by the commissioners of streets and roads in the city of New York, under and by virtue of the act entitled ' an act relative to improvements touching the laying out of streets and roads in the city of New York, and for other purposes,' passed April 3, 1807 ; and also whenever and as often as so many proprietors of lands fronting on any such street, avenue, square or public place, or any particular part or section of any such street, avenue, square or public place, as shall together own three-fourth parts of all the lands fronting on such street, avenue, square or public place, or on such part or section of any such street, avenue, square or public place, shall, by petition, desire the said mayor, aldermen and commonalty to open any such street, avenue, square or public place, or any such particular part or section of any such street, avenue, square or public place, and the said mayor. aldermen and commonalty shall deem the opening thereof to be necessary or useful ; it shall be lawful for the said mayor, aldermen and commonalty to cause the same to be opened, and the lands, tenements and hereditaments that may be required for the purpose of opening the same, may be taken for that purpose, and compensation and recompense made to the parties and persons, if any such there shall be, to whom the loss and damage thereby shall be deemed to exceed the benefit and advantage thereof, for the excess of the damage over and above the value of the said benefit, in the manner hereinafter for that purpose directed and pescribed ; and whenever and as often also as it shall, in.the opinion of the .said mayor, aldermen and commonalty in common council convened, be necessary or desirable for the public convenience or health, *to lay out, form and open any street or streets, or public place or places in any part of the said city, not laid out into streets, avenues, squares and public places by the commissioners of streets and roads in the city of New York,* under and by virtue of the act aforesaid, or to extend, enlarge, straighten, alter or otherwise improve any street or streets, or part of a street, or public place or places already laid out, or hereafter to be laid out, and formed or opened in any part of the said city not laid out into streets, avenues, squares and public· places by the commissioners aforesaid ; *it shall be lawful for the said mayor, aldermen and commonalty of New York to order and direct the same to be done. and· to cause the same to be done accordingly in such manner as they shall think most advisable,* notwithstanding it may become necessary for that purpose to remove any building or buildings, or tô take any lands, tenements, hereditaments or premises whatsoever ; and if the said mayor, aldermen and commonalty shall require any lands, tenements, hereditaments or premises of any person or persons, or body politic or corporate for any such purpose, the same may be taken and appropriated to such use, and compensation and recompense made to the parties and persons respectively, if any such there shall be, to whom the loss and damage thereby shall be deemed to exceed the benefit and advantage thereof, for the excess of the said damage above the said benefit, in the manner for that purpose hereinafter mentioned and provided." (*See Act of* 1813, § 177 ; *Davies, Laws,* 527, 528, 529.)

In reference to this section, we say that, taken in connection with the ample powers already conferred upon and vested in the mayor, &c., of New York, by the Montgomerie charter, the whole power of opening, laying out, grading, etc., of streets in the Island of Manhattan, was conferred upon the city authorities.

1st. The first part of the section 'confers the power to make application for the opening of any street, avenue, &c., *laid out* by the commissioners appointed under the act of 1807.

2d. The second part of the section confers the power to *lay out, form and open any*

*street or streets*, or public place or places, in any part of the city, *not laid out* by the commissioners of streets and roads, &c., and to make the necessary applications for acquiring the lands therefor.

*C.* In the next place we say, that the powers above referred to are local powers, and have, ever since the organization of the government of this state, been recognized as such.

We are thus brought down to the question, whether the act of 1865 is in conflict with the section of the constitution set forth in our previous points.

In examining this question, we cannot do better than to quote from the recent opinion, delivered by Judge GROVER, of the court of appeals, in rendering the decision of that court, in the case of *The People* agt. *Raymond*, deciding that the act of 1867, chapter 410, authorizing the appointment of commissioners of taxes and assessments by the governor and senate, was in conflict with the provisions of the section of constitution above referred to. He says:

"To determine whether the act in question is constitutional, so far as the power of appointment is thereby vested in the governor, with the consent of the senate, *it is necessary to determine whether the office in substance existed at the time of the adoption of the present constitution;* and if found not so existing, then the further question whether city, town and county offices subsequently created, may be filled in any mode prescribed by the legislature. To determine the first question, it is necessary to ascertain the functions and duties of the office in question. Thus upon examination of the act in question (the act of 1859, p. 678, the acts of 1857 and 1850), and the previous legislation, these will be found to consist of power to appoint deputies, clerks, etc.; who, together with the officers in question, by performing the various duties of their respective offices, are to make an assessment of all the property liable to taxation in the city for municipal and state purposes. To correct the rolls of such assessments, and to equalize the same, and to preserve such rolls in an office to be kept by them, and deliver the same to those whose duty it is to levy the taxes upon such rolls, authorised upon the property of the city. *It is necessary also, to inquire whether the like functions were performed by any officers prior to the existing constitution.* This, all know, must have been so, as taxation upon property is not wholly of modern origin, but has existed at intervals for state purposes, and at all times for municipal purposes, since the existence of the state; and there must necessarily have been at all times some mode by which a valuation of the property, liable to taxation, was made by public authority, as a basis upon which taxes were apportioned among its owners. An examination of the statutes in force at the adoption of the constitution, will show that such valuation was then made by assessors, chosen by the electors of the respective wards of the city, two in each ward. That these ward assessors were required to assess all the taxable property in their respective wards; and when this was completed, they were all required to meet together as a board, and when so met, to compare, equalize and correct all the assessment rolls of the city; and when completed, the assessors were to deliver the same to those whose duty it was to apportion the taxes required to be collected upon the basis of such valuation. *Thus it appears that precisely the same essential functions* were performed in making, equalizing, correcting and delivering the assessment rolls by the ward assessors at the time of the adoption of the constitution, that were contemplated to be performed by the commissioners of taxes and assessments by the act in question; *that, although the names of the officers and their mode of appointment have been changed, the result to be accomplished by the one is identical with that of the other.* But it is argued on the part of the appellant that additional powers have been *conferred and additional duties imposed upon the commissioners.* This is true. They are to keep an office during the entire year, in which the rolls are to be kept for

inspection; they are to procure and preserve maps of the lots in the city; to keep a record of the building permits; to them power is given to insert in the rolls of prop·erty which has been omitted, and to do some other acts, none of which were required of the assessors, and which they were not authorized to do. *But an examination of these new duties and powers will show that they are all such as are calculated to facilitate and the better enable them to perform the same essential duty performed by the assessors—that is, of perfecting a valuation of the property as a basis of taxation. Such additional facilities in the performance of the same duties, surely cannot make them new officers in the sense of the constitution. If they can thus be made new, the section of the constitution, above quoted, may readily be made a mere nullity.* I am far from conceding that it would be competent for the legislature to take from the city all control over the assessment of the property of the city for purposes of taxtion, and vest this power in the central authority, by conferring powers upon officers or boards, upon which they conferred it over other subjects, and imposing duties upon them entirely foreign to those of making the assessment. *The plain intention of the section of the constitution in question was to preserve to localities the control of the official functions of which they were then possessed;* and this control was carefully preserved, consistent with the power of the legislature to make needful changes, by restricting the power of appointment of other officers to perform the same functions to the people, or some authority of the locality. *Any other construction would render the section in question, when applied to the cities of the state, substantially nugatory.* It is not enough that the name of the officer is changed or the powers enlarged, to authorize the legislature to confer upon the governor the appointment of officers to discharge the duties performed by city officers at the adoption of the constitution."

By the first section of the act of 1865, it is provided that:

"The commissioners of the Central Park·shall have and possess exclusive power to lay out streets, roads, public squares and places, within that part of the city of New York to the northward of the southerly line of One Hundred and Fifty-fifth street, of such width, extent and direction upon such grades as to them shall seem most conducive to public good; and it shall be the duty of the said commissioners, as soon after the passage of this act as may be, to lay out a road or public drive running from the northerly portion of the Sixth or Seventh avenue in a generally northerly or northwesterly direction, upon the easterly or Harlem river side of the city, as far north as the said commissioners may determine; thence in a general westerly direction to or near the Hudson river, and thence in a general southerly or southeasterly direction along the westerly or Hudson river side of the city, until such road or public drive shall enter the Central Park at or near the junction of the Bloomingdale road, Eighth avenue and Fifty-ninth street; such road to follow the course of the Bloomingdale road below One Hundred and Sixth street, whenever the commissioners shall deem such course advantageous. The said commissioners shall determine the location, width, courses, windings and grades of said road, and public drive, and may widen the Bloomingdale road, and determine the grades thereof, and of intersecting streets and avenues, as they may deem it necessary for the perfecting of such road or public drive." (*Laws of* 1865, 1136.)

By the fourth section of the act of 1865, it is provided that:

"The commissioners of the Central Park, for and in behalf of the mayor, aldermen and commonalty of the city of New York, are authorized to acquire title for the use of the public to all or any of the lands required for the streets and roads, public squares and places, so laid out by them, or any portion of said streets, roads, public squares and places, whenever they shall deem it for the public interest so to do, and such commissioners may for that purpose make application to the supreme court, in the first judicial district, for the appointment of commissioners of estimate

and assessment, specifying in such application the lands required *for that purpose ;* and the proceedings to acquire title to such lands shall be had pursuant to such acts as shall then be ṃ force, relative to the opening of streets, roads and public squares and places in the city of New York, which said acts, so far as the same are not inconsistent with the provisions of this act, are hereby made applicable to the streets, roads, public squares and places so laid, or to be laid out by the said commissioners of Central Park, in the same manner and to the same extent as ıf the said streets, roads, squares and places had been originally laid down as and for public streets, roads, squares and places, by *the commissioners appointed in* and by the act entitled ' an act relative to improvements touching the laying out of streets and roads in the city of New York, and for other purposes,' passed April 3, 1807, except that the said commissioners of estimate and assessment, who may be appointed as herein provided. may assess for such opening all such parties and persons, lands and tenements, as they may deem to be benefited by such improvement, to the extent which said commissioners deem such parties, persons, lands and tenements benefitted thereby, provided, that as to streets or roads more than one mile in length, not more than one-half of the amount awarded for damages and of the expenses attending such opening, shall be so assessed, the amount of such damages and expenses not so assessed being hereby made a charge upon the county of New York, to be paid as hereinafter provided. *The moneys collected upon the assessments of the commissioners of estimate and assessment shall be paid into the county treasury.* (*Laws of* 1865, 1138.)

It will be perceived that by the sections above quoted, the Central Park commissioners have exclusive power to lay out streets, roads, public squares and places, northward of the southerly line of One Hundred and Fifty-fifth street.

This is a part of the city *not laid out* into streets, &c., by the commissioners of 1807. Their plan only extended to One Hundred and Fifty-fifth street.

Now, by the act of 1813, the corporation of the city had full power "to lay out, form and open any street or streets, or public place or places, in any part of the said city *not laid out* by the commissioners of streets and roads," appointed under the act of 1807, and to make the aplication to the court *for taking* the lands required therefor. (*See* § 177, *supra*.)

These are precisely the powers which are now sought by the act of 1865, to be given to the commissioners of the Central Park.

*D*. If it should be said that the public road or drive which forms the subject of this proceeding, is bounded by One Hundred and Fifty-fifth street and Fifty-ninth street, and therefore it is within the section of the city which was laid out by the commissioners of streets ahd roads, we answer that,

1st. We conceive that under the provisions of the section of the Montgomerie charter above set forth, the coporate authorities possessed the power to lay out and form such a road or drive in the section of the city laid out by the commissioners aforesaid. (*Charter*, § 16, *supra*.)

2d. That the powers conferred by the act of 1813, are merely cumulative to those granted by the Montgomerie charter, and that said act does not take away the rights granted by the charter-

3d. That the whole charge of the proceedings in the city of New York, relative to opening streets therein having been committed to the mayor, &c., by the act of 1813, the power was a local function which was preserved to the city by the constitution of 1846.

4th. That the act of 1865 *presents a general system, scheme or plan of* improvement, and that the different parts of such plan and scheme are so interwoven that

they cannot be separated; and if the act is unconstitutional as to one part of the scheme, it is void as to the whole.

*E.* Again, the eighth section of the act of 1865 confers upon the commissioners of the Central Park power "from time to time to cause such of said streets, roads, squares or places, as they may designate for that purpose to be regulated, graded and improved as streets or as country roads, or in such manner as the said commissioners may deem for the public interest, and may direct, and for that purpose, and in and about such regulating, grading and improvements the commissioners of the Central Park shall have power and enjoy all the powers now or heretofore possessed, enjoyed or exercised by the mayor, aldermen and commonalty of the city of New York as to other streets and roads, and by such commissioners in respect to the Central Park in said city," &c.

Under the 175th section of the act of 1813, it is provided as follows:

"*And be it further enacted,* That it shall be lawful for the said mayor, aldermen and commonalty to cause common sewers, drains and vaults to be made in any part of the said city, *and to order and direct the pitching and paving the streets thereof,* and the cutting into any drain or sewer, and the altering, amending, cleansing and scouring of any street, vault, sink or common sewer within the said city, and the raising, reducing, leveling or fencing in any vacant or adjoining lots in the said city, and to cause estimates of the expense of conforming to such regulations to be made, and a just and equitable assessment thereof among the owners or occupants of all the houses and lots intended to be benefited thereby, in proportion, as nearly as may be, to the advantage which each shall be deemed to acquire." (*Davies' Laws, p.* 526.)

The act of 1865 distinctly transfers the powers of the corporation relative to regulating and grading streets above One Hundred and Fifty-fifth street to the commissioners of the Central Park.

It seems clearly to follow, then, that the act of 1865 is unconstitutional, because it takes away from the mayor, aldermen and commonalty of the city of New York local functions and powers which they were in possession of and exercised long prior to the adoption of the constitution of 1846, and transfers them to the commissioners of the Central Park, who are officers appointed by the legislature—officers in whose appointment neither the electors of the city nor the local authorities had any choice. (*Laws* 1857, *vol.* 2, *p.* 715; *Laws* 1859, *p.* 857; *Laws* 1861, *p.* 164; *Laws* 1866, *vol.* 1, *p.* 822, § 8.)

*Second.* As to the case of the Central Park extension (16 *Abb.* 56), it is only necessary to observe:

1st. That it was decided before the decisions in the recent cases in the court of appeals, construing the section of the constitution which we refer to, and defining the powers and rights of localities under that section. (*People* agt. *Raymond,* 1868; *Devoy* agt. *Mayor, &c.,* 36 *N. Y. p.* 449; *and see Judge* INGRAHAM's *opinion in People* agt. *Board of Metropolitan Police,* 33 *How.* 52, 61; *and see Judge* SMITH's, *in same case, p.* 62.)

2d. That it was a decision made at special term, and although entitled to great respect, is not controling at general term.

3d. That the main point discussed in that case was as to the legality of the appointment of the Central Park commissioners themselves.

*Third.* The objector Witthaus had no such notice of the application for the appointment of the commissioners of estimate, and of the nature and extent of the improvement, as was contemplated by the statute. (*Laws* 1839, *p.* 183.)

The notice states that the said road or public drive is "to commence at the junction of Bloomingdale road, or Broadway, Eighth avenue and Fifty-ninth street; running thence northerly or northeasterly, and following the general course of

Bloomingdale road, or Broadway, to the northerly side of Eighty-seventh street, etc. * * * * Said road or public drive includes the whole of said Bloomingdale road, or Broadway, between Fifty-ninth and One Hundred and Seventh streets, *except a portion thereof between Seventy-fifth and Seventy-seventh streets and another portion thereof between Eighty-sixth and One Hundred and Fourth streets, in the city of New York.* Said road or public drive is of a *general width of one hundred and fifty feet,* as shown and delineated on a certain map of the same, made by Gardner A. Sage, city surveyor, and now on file in the office of the commissioners, of Central Park."

The land of Mr. Witthaus borders on Broadway, but to take it for the proposed improvement the commissioners, instead of laying out the road or public drive on the general course of Bloomingdale road, have turned off their line at right angles, or nearly so.

There is nothing on the face of the notice to advise Mr. Witthaus that the road was to be more than one hundred and fifty feet in width at the point where his property was situated.

The reference to the map on file in the office of the commissioners of the Central Park does not obviate this defect, because the act of 1839 requires that "the notice shall specify the nature and *extent* of the intended improvement. (*Laws* 1839, § 2, *p.* 183.)

The notice in this case does not state the *extent* of the improvement, and it is also calculated to mislead the parties interested as to the *nature* of the improvement. The proceedings being statutory, the power sought to be exercised under the statute must be strictly followed. (*Sharp* agt. *Spier,* 4 *Hill,* 76 ; *Sharp* agt. *Johnson,* 4 *Hill,* 92 ; *Rathbun* agt. *Acker,* 18 *Barb.* 393.)

*Fourth.* There was no answer made on the argument to the point that under the provisions of the act of 1862, entitled "An act to prevent fraud in the opening and laying out of streets and avenues in the city of New York," the commissioners were bound to complete their proceedings within four months from the time of their appointment, unless further time is allownd by the supreme court, except that the act did not apply to this case. (*Laws* 1862, *p.* 967.)

(*a.*) We answer that it does apply to this case, and is made applicable to it by the act of 1865. (*Laws of* 1865, *p.* 1138.)

(*b.*) That the act of 1862 is referred to in these proceedings as being one of the acts under which they are taken. (*See order appointing commissioners.*)

*Fifth.* The points above taken were prepared in reply to the argument made on the motion to confirm the report, and before the printed points of the· corporation counsel were received by us. · There are a few points made by the learned counsel, to which we further reply as follows :

*Sixth.* The objection in the counsel's ninth point, that it is too late for Mr. Witthaus to object to the authority of the commissioners, for the reason that he appeared before them and argued his objections there, is not well founded in reason or in law.

(*a.*) The objection to the jurisdiction of the commissioners was taken in the objections filed by the objector.

(*b.*) If we are right in the supposition that the act of 1865 is unconstitutional, it is a *mere nullity,* and no jurisdiction can be acquired under it.

(*c.*) Where a tribunal has no jurisdiction of a subject matter, no consent of parties can confer such jurisdiction. (*Dudley* agt. *Mayhew,* 3 *Comst. p.* 10 ; *Davis* agt. *Packard,* 6 *Peters, p.* 276 ; *Coffin's ex'rs* agt. *Tracy,* 3 *Caine, p.* 128 ; *Lindsley* agt. *McLelland,* 1 *Bibb, p.* 262 ; *Heyer* agt. *Burger, Hoffman's Chan.* 1 ; *Beach* agt. *Nixon,* 5 *Seld. p.* 35.)

(*d.*) The objection to the jurisdiction can be taken at any time. (*Garcie* agt. *Sheldon*, 3 *Barb. p.* 232; *People* agt. *N. Y. Marine Court*, 3 *Abb. p.* 309.)

*Seventh.* The counsel, by his second point, admits that under the act of 1813 the mayor, &c., had power to open streets in that part of the city *not* laid out under the act of 1807. As we have stated in our first point (subdivision C), the commissioners of 1807 only laid out the city to One Hundred and Fifty-fifth street. (*See Report of Commissioners, Davies, p.* 438; *See map of Commissioners,* 1807.)

The counsel is in error in supposing that the whole of the city was laid out above Fourth street.

As far, then, as the power to lay out streets, &c., above One Hundred and Fifty-fifth street, is concerned, the act of 1865 is in conflict with the constitution of 1846; and as the act of 1865 consists of one general scheme or plan, one part of which is void, the whole must fall.

*Eighth.* As to the powers of the mayor, &c., under the act of 1813, and under the Montgomerie charter, it seems unnecessary to add anything to what we have stated in our first point.

*Ninth.* As to the points upon the question of value, we refer to the printed points submitted by us on the argument.

*Tenth.* As to the point made in the second point of the counsel, that inextricable confusion and serious damage would result from declaring the act of 1865, and the other acts which are referred to, to be unconstitutional, the plain and conclusive answer is, that it is much better to ascertain now, when the proceedings of the commissioners of the Central Park have, as it were, just commenced, whether those proceedings are legal or illegal, than to wait until the contemplated improvements have been made and the assessments therefor are laid.

The confusion and damage which would result now are unimportant and insignificant, when compared with the damage that must ensue at a later period, if those acts are then determined to be in conflict with the constitution.

These questions will have to be met in the proceedings to set aside the assessments imposed under the authority and powers delegated to the commissioners.

Again, the practical effect of the acts referred to by the learned counsel, enlarging the powers of the commissioners of the Central Park, is to abolish the mayor, aldermen and commonalty of the city, so far as the streets are concerned, between Fifty-ninth street and the northern limit of the island, and to substitute the park commissioners in their place. This is a change of the gravest and most serious character, not to be upheld, unless clearly within the powers of the legislature, and clearly in accordance with the constitution.

If there is any vitality in the Montgomerie charter, any force in the solemn confirmations of that charter which have from time to time been made by the state, all the powers now sought to be intrusted to the park commissioners have been lodged in the corporate authorities for nearly two centuries, and it would be far more reprehensible to sustain legislation which nullifies that charter than to declare such legislation to be null and void.

*Eleventh.* As the points of the counsel have been served upon us at a time which renders it impossible to print a more extended reply, we now submit this case to the court upon the points above taken, and upon those presented by us at the argument, confidently believing that it will receive the full and thorough consideration which its importance demands.

*By the court,* INGRAHAM, J.   The objection taken to these proceedings, on the ground that the act is unconstitutional,

cannot be sustained. The power, it is alleged, to make the application, which by the act is vested in the commissioners of the Central Park, should have been given to the common council, and the objectors claim the act on that account to be unconstitutional. The common council never had authority, since 1807, to lay out any streets or public places in that part of the city which was embraced in the map of the commissioners filed under the act of 1807. Their power was below the limits embraced in that map, and the authority conferred upon the commissioners did not in any way interfere with the authority previously bestowed on the common council. The act of 1813 expressly limited their powers to that part of the city not laid out by virtue of the act of 1807. They had no authority to lay out or open any but such as were provided for on the said map. The authority conferred on the commissioners is not that of any local officer, nor does it authorize them to discharge the duties of any office, but it provides for a discharge of a mere ministerial act, viz., presenting to the court a petition for the opening of a street. So far as the objection is taken here, we are to treat it as a mere authority for such a purpose to make an application to the court for the opening, and that power may, I think, be conferred on the commissioners. This objection was made to the proceedings in the matter of the Central Park extension. (16 *Abb. p.* 56.) I see no reason to change the views thus expressed by me against the validity of the objection.

I do not intend to be understood as holding that all the powers conferred on the commissioners by this statute are valid. The right to grade streets in this city has always been exercised by the common council, as well as other powers conferred by that act on the commissioners, and it may well be doubted whether the legislature can take from the common council this power and confer it on state officers. It is not, however, necessary on this application to decide this point, and I make the suggestion merely to avoid the

supposition that it is intended in this decision to validate all the powers granted by that statute.

The legislature might have laid out this drive in the act, and having that power, they might authorize others to do it. In fact, no such road or drive could be laid out without the authority of the legislature; and whenever it has been necessary to open any new street or avenue not laid down on the map, such legislation has been deemed necessary, and the limits of the street or avenue have been fixed by the statute. There are several cases where such acts have been passed, without any action of the common council, such as Madison avenue, part of Second avenue, and others, where proceedings have been taken by other parties than the common council. The limitation of four months within which the commissioners are required to complete their report, contained in the act of 1862, does not apply to this proceeding. It applies to streets and avenues in the city north of Fourteenth street, and must be confined to streets and avenues then laid out as such, and is not to be applied to such a work as that contemplated by this statute. It is evidently impracticable properly to complete such a work within that limitation.

Objections are made in several cases to the amounts allowed by the commissioners for the property taken, and the court is asked to review the decisions of the commissioners in this respect. It has been long since settled, and has uniformly been acted upon by this court, that a mere error of judgment in the valuation of property taken was not the subject of review on a motion to confirm the report, unless the sum allowed was grossly inadequate and unequal as compared with other valuations, or unless some wrong principle was adopted as to the amount allowed. There are good reasons why such a rule should be enforced. The commissioners have the opportunity of examining the property, of seeing its location and condition, its adaptation to use, and of inquiry as to value, not in the power of the court, and

the result of such examinations and inquiries cannot be brought before the court. There may have been difference of opinion between the owners and the commissioners as to these values, but we see nothing in this difference justifying us to interfere. There is no error in law in any mode of valuation which has been adopted, and we see no ground on which, according to all former decisions, we could interfere with the valuations as made by the commissioners, in the case of any of the parties objecting.

The remaining objection is to the taking of gores outside of the line of the road as laid out, if the same is to be of one continuous width. The statute describes it as a road or public drive running from the northerly portion of the Sixth or Seventh avenues, &c., and to enter the Central Park at or near the junction of the Bloomingdale road, Eighth avenue and Fifty-ninth street, and to follow the course of the Bloomingdale road below One Hundred and Sixth street, when the commissioners should deem such course advantageous. It then provides that they shall determine the location, *width*, courses, windings, &c., of said road.

It is very clear that this act does not authorize the taking of any land not required for the drive or road, and the latter provision seems to prescribe an uniform width to the road very inconsistent with the lines as adopted on the map filed.

The act of 1839, page 182, directs how the commissioners shall be appointed, viz., by a notice specifying the time and place of the application and the nature and extent of the intended improvement. This provision is made necessary by the act of 1865, in regard to this proceeding.

Under this provision, I think it is necessary that the whole extent of the intention of the opening should be stated in the notice. The owners are to be informed by it what property is to be taken. A reference to a map on file in some public office is not a compliance with the statute.

It is said that the owners have in some cases appeared before the commissioners and claimed allowances for their

lands, and therefore cannot now object. But that cannot give jurisdiction, if it is not acquired in the mode prescribed by law. Suppose they had proceeded, in addition to the road, to take land for a square outside of the drive, and the owners submitted their claims, it could not be upheld that the commissioners thereby acquired jurisdiction to take the same. They must be confined to the land which the notice describes as required for the improvement.

Considering the intent of the statute to make a road of an uniform width, and the notice as given of such a road, without referring to the gores outside of the road, I do not see the necessary authority for taking land outside of the lines of the road as laid out by them. But this is not all. The notice not only does not include these gores, but virtually excludes them, by the following: "Said road or public drive is of a general width of one hundred and fifty feet, as shown on a certain map," &c. Parties owning lands outside of the road so described could not be notified that it was intended to go outside of these lines and take large parcels of land at different places on the route. The commissioners had no jurisdiction to take these gores, and, so far as they are included in these proceedings, they are erroneously taken.

The report should be sent back to the commissioners, with directions to omit the valuation of the land outside of the road, as described in the notice; to deduct the amount awarded therefor from their assessment, in such manner as they shall deem just; and to assess the same for benefit, if such lands are benefitted by the improvement.

BARNARD and SUTHERLAND, Justices, concurred.