proof that it injuriously affected the value of the premises; and, besides, that before the sale the lessee had erected a large and valuable building, leaving the courtyard required by the agreement, which was known to the purchasers when they bid. In this case the court has decided that the "effect of the restrictive agreement was to impose upon the premises a servitude." Though "servitude" and "easement" are often used indiscriminately, the latter term generally refers to a burden imposed. Washburn, Law of Easements and Servitudes, § 6; Fetters v. Humphreys, 18 N. J. Eq. 260, 262. In Uihlein v. Matthews, 172 N. Y. 154, 158, 64 N. E. 792, a similar restriction was said to impose a servitude. The court had before it the location and character of the property, and the nature and effect of the agreement, and it does appear that the property was improved. I think that the court might fairly infer, and that it has decided, that the effect of the agreement was to impose a servitude upon the land. I do not find that any exception was taken to the finding of a servitude. Riggs v. Pursell, supra, was distinguished in Wetmore v. Bruce, 118 N. Y. 319, 323, 23 N. E. 303. The court also intimates that there is a question whether the doctrine of that case, which arose out of a judicial sale, is applicable, in any event, to a private sale. In Heller v. Cohen, 154 N. Y. 299, 306, 48 N. E. 527, 528, the court say:

"To entitle a vendor to specific performance, he must be able to tender a marketable title. A purchaser ought not to be compelled to take property, the possession of which he may be obliged to defend by litigation. He should have a title that will enable him to hold his land free from probable claim by another, and one that, if he wishes to sell, would be reasonably free from any doubt which would interfere with its market value. If it may be fairly questioned, specific performance will be refused. Vought v. Williams, 120 N. Y. 253, 257, 24 N. E. 195, 8 L. R. A. 591, 17 Am. St. Rep. 634; Shriver v. Shriver, 86 N. Y. 575, 584; Fleming v. Burnham, 100 N. Y. 1, 2 N. E. 905."

The judgment should be affirmed, with costs. All concur.

---

(97 App. Div. 580.)

MOTT et al. v. ENO.

(Supreme Court, Appellate Division, First Department. November 11, 1904.)

1. HIGHWAYS—OWNERSHIP OF FEE—PRESUMPTION.
    It is presumed that the fee of a road opened under the English common law remained in the former owner of the property, the public acquiring a mere easement.

2. PARTITION—ASSIGNMENT OF PURPARTS—LAND INCLUDED—STREETS.
    Where, in a partition agreement ratified by a conveyance from the other tenants in common, lots on each side of a road were set apart to one of the tenants, he became seised in fee of the land on both sides of the road, including the fee of the road, subject to the public easement.

3. HIGHWAYS—TITLE TO FEE—EVIDENCE—PROCEEDINGS OF CITY COUNCIL.
    Resolutions of the common council of a city ordering the widening of a road, and appointing a committee to open it and confer with the proprietors of land on the subject, do not prove the acquisition of title to the fee of the road by the city, in the absence of evidence that any proceedings were taken under the resolution, or award made to the owners of the property taken.

¶ 2. See Highways, vol. 25, Cent. Dig. § 288.

**4. SAME—REPORT OF COMMISSIONERS—CONFIRMATION—EVIDENCE.**

An indorsement on the back of a report of commissioners of estimate and assessment in road proceedings signed by the clerk of the Supreme Court, and stating that the report was confirmed by the court, was sufficient evidence of the confirmation, without a formal order thereof; but the further publication of the confirmation, and the action of the city and property owners in imposing an assessment for the cost of the proceedings, and the payment of awards by the city, based on such confirmation, were sufficient to require a finding that the report had been confirmed.

**5. SAME—CONDEMNATION PROCEEDINGS—EFFECT ON FEE.**

Laws 1847, p. 196, c. 203, declared a certain road in the city of New York to be, for all legal purposes, a city street. Subsequently, upon the petition of the city, the Supreme Court appointed commissioners of estimate and assessment to act in proceedings for the appropriation of certain property along the road, in order to properly open it as a street. The commissioners filed their report, describing certain parcels of land for which awards were to be made, but made no mention of the ownership of the fee of the road, and made no award for the rights of the owners of the fee. *Held,* that the proceedings did not divest the property owners of their fee in the road.

**6. EMINENT DOMAIN—COMPENSATION—PROPERTY TO BE PAID FOR—FEE OF STREETS.**

Under Const. 1846, art. 1, § 6, providing that private property shall not be taken for public use without compensation, a municipal corporation cannot take the fee of a street which belongs to a private proprietor without paying therefor.

**7. SAME—ADJUDICATION OF TITLE.**

Condemnation proceedings in the matter of opening a public street cannot be construed to adjudicate that title to the fee of the street is in the city, in the absence of a determination ascertaining the value of the interest of the private proprietors in the fee, and making an award therefor.

**8. ADVERSE POSSESSION—FEE OF STREET—ABSENCE OF HOSTILE CLAIM.**

Possession by the public of a street does not give it title to the fee in the street by adverse possession, where it makes no claim to ownership of the fee adverse to that of the true proprietor.

**9. PARTITION—PROPERTY INCLUDED—FEE OF STREET.**

Where an action was brought to partition all the property in which tenants in common were interested, and the complaint described the interest in the fee of the street, as well as the abutting property that was to be partitioned, and the commissioners were directed to partition the property, so far as could be, to carry out a prior partition, which would have vested in the abutting owners the fee of the street, had it been valid, and the commissioners reported that they had complied with this direction, a finding is warranted that it was intended to include in the award of lots set apart in the partition one-half of the fee of the street upon which the lots abutted.

**10. DEEDS—DESCRIPTION—PROPERTY CONVEYED—FEE OF STREET.**

Where a lot owner, to whom the fee to half of the street on which the lots abutted had been awarded in partition proceedings, conveyed his lots by a deed describing the property by metes and bounds, in such a manner as to expressly exclude the street, his grantee took no interest in the fee of the street.

**11. STREETS—OWNERSHIP OF FEE—CESSATION OF EASEMENT—RIGHTS OF PROPRIETORS.**

Laws 1869, p. 2236, c. 890, relative to the widening of a certain street, which provided that, if any part of the street should be closed, any owner of land abutting on the part so closed might acquire an exclusive right to so much of that part as lay between the present front line of his land and the line of the street as it might be established, was ineffectual to divest persons who owned the fee in the street, subject to the public ease-

90 N.Y.S.—39

ment, of their title to such fee; but, when the public discontinued its use of the land constituting the street, the land belonged to such owners, discharged from the public easement.

12. SAME.

Where a person owning property abutting upon a road conveys it to another, bounding it on the road, he subjects his interest in the road to an easement in favor of the property conveyed; and the property right thereby vested in the grantee cannot be appropriated, and the servient estate discharged from the easement, by legislative action.

Hatch and McLaughlin, JJ., dissenting in part.

Cross-Appeals from Judgment on Report of Referee.

Action by Hopper S. Mott and others against Amos F. Eno. From the judgment entered upon the report of the referee, both parties appeal. Affirmed.

Argued before VAN BRUNT, P. J., and HATCH, McLAUGHLIN, O'BRIEN, and INGRAHAM, JJ.

James A. Deering, for plaintiffs.
David B. Ogden, for defendant.

INGRAHAM, J. The argument in this case has extended over a wide range, involving the consideration and construction of wills and conveyances of real estate, judgments in partition, and proceedings and statutes in relation to the opening and closing of Bloomingdale Road, extending over a period of 200 years. It would be impossible, within the limits of a judicial opinion, to discuss all of the questions involved. The action is in ejectment, and the chain of title and the various instruments upon which it is based are set forth in the opinion of the learned referee. We agree with the referee that there was no evidence to show that Bloomingdale Road was opened prior to the conquest of New York by the British. It is possible that a country road was in use, a part of which was subsequently called "Bloomingdale Road," prior to the passage of the act of the Colonial Legislature' in 1703 (1 Colonial Laws of New York, p. 532, c. 131). The return of the commissioners appointed under that act, dated June 16, 1707, certifies that they have "viewed and laid out a road" which would seem to have been identified with the Bloomingdale Road, as it subsequently existed; and this action of the commissioners under the act of 1703 is the first indication that a public road was established at this locality. The road thus laid out was located "forward as the said Road now lyes unto thennis Edis's and Capt. D'Keus thro' the said Edis's land," which would indicate that, at the time this report was made, the road from Great Kills was in existence; but there is nothing to show that prior thereto it was a public road. An act passed November 25, 1751 (3 Colonial Laws, p. 844, c. 910), recites that in pursuance of the act of 1703 "the commissioners therein named for the City and County of New York did lay out a road of the bredth of four rods from the now dwelling house of John Horne thro' Bloomendale District or division to the now dwelling house of Adrian Hoogelandt"; and it would appear that this road was treated, both by the commissioners appointed by the act of 1703, in their report, and by the Colonial Legislature by the act of 1751, as a road laid out and established under the act of 1703. In the patent of Gov. Nicholas van Burgh and others, dated October 3, 1667,

and in the deed from Webbers to Balme, dated November 2, 1713, which conveys tracts of land through which this road runs, no mention is made of it as an existing road; and the same may also be said of the deed from Balme to Hoppe, dated August 13, 1714. And while this negative evidence is of slight force, as undoubtedly the road was in use prior to 1713, the date of the earlier of the two deeds above mentioned, it tends to confirm the statement in the act of 1751 that this road was actually laid out by the commissioners under the act of 1703. Judge Hoffman, in his treatise on the Estates & Rights of the Corporation of New York, treats Bloomingdale Road as laid out by the commissioners under the act of 1703; and the survey that was made and filed on the 16th day of June, 1707, by the commissioners, under that act, is printed in the appendix to the Estate & Rights of the Corporation of New York by Judge Hoffman (volume 2, p. 250).

There is nothing to overcome the presumption that an open road existing in a country subject to the rules of the common law is a road in which the fee is vested in the adjoining owners, the public having an easement. This presumption is stated in Dunham v. Williams, 37 N. Y. 251, to be that the road "was originally taken from the adjoining owners, and for the sole purpose of being used as a thoroughfare."

A piece of land which includes the premises in question, through which the Bloomingdale Road runs, was in 1714 conveyed to Matthias Hopper, and subsequently became vested in John Hopper, who on the 12th of October, 1778, made his last will and testament, by which it was devised to his children and grandchildren; and on February 4, 1782, the devisees entered into a partition agreement by which this property was divided. Lot No. 6 on the west and Lot No. 6 on the east side of Bloomingdale Road, which included the premises in question, was set apart to John Hopper the younger, and this partition was ratified by a conveyance from the other tenants in common. We think by this partition John Hopper became seised in fee of the land on both sides of Bloomingdale Road, including the fee of the road, subject to the public easement. He made his will on the 13th day of September, 1815. He left surviving him his widow and three grandchildren, the children of a deceased daughter, Mary Striker. This will has been the subject of much litigation, but was finally construed by the Court of Appeals, in Striker v. Mott, 28 N. Y. 82, as creating a trust to continue during the life of his three grandchildren, with a vested remainder in their heirs.

Of the grandchildren of John Hopper, the youngest, Ann Striker, died April 17, 1860, without issue. Winifred Mott died March 16, 1862, leaving issue; and Garrit H. Striker died April 15, 1868, leaving two sons (James A. Striker, who died in 1900 without issue, and Ambrose K. Striker, who died March 16, 1883, intestate, without issue) and two grandchildren (Elsworth J. Striker, still living, and Joseph M. L. Striker, who died without issue June 13, 1883). The descendants of Garrit H. Striker would therefore be entitled to one undivided half of the property of John Hopper the younger, and the descendants of Winifred Mott to the other undivided half. The fee of Bloomingdale Road passed under this will to his three grandchildren and their heirs, subject to the trust; the premises in dispute being a portion of Bloom-

ingdale Road as it existed at the time of the death of John Hopper the younger. Winifred Mott, one of the devisees of John Hopper the younger, died on March 16, 1862, leaving, her surviving, four sons —Garrit Striker Mott, who died in 1869, unmarried and without issue; Jordan Mott, who died February 20, 1874, unmarried and without issue; and Matavus Hopper Mott, who died in 1864, leaving two sons, the plaintiffs Hopper S. Mott and Alexander H. Mott, as his heirs, and his widow, the plaintiff Ruth Ann Wallace; and the plaintiffs claim title to the property as the heirs at law of Winifred Mott, one of the grandchildren of John Hopper, the younger. The plaintiffs' right to recover, therefore, depends upon their proving that the share of Winifred Mott, a devisee of John Hopper the younger, in the bed of Bloomingdale Road, vested in their ancestor, to which, as her heirs at law, they are entitled to an interest.

The very thorough discussion of the various questions presented by the learned referee, with whom, in the main, we concur, renders it unnecessary for us to do more than state our conclusions upon the objections taken by the learned counsel for the appellant, upon which he seeks to reverse the judgment.

The first point is that Bloomingdale Road, in front of these premises, was opened as a road during the time that this city was in the occupation of the Dutch government, and that therefore the fee of this road was vested in that government, and upon the conquest of New Netherlands by the English the fee of that road vested in the English crown, and was transferred by the early charters to the city of New York. But as we have said, we can find no evidence to show that this road was a public highway prior to the transfer of the colony of New York to the British government; and the ordinary presumption applies, that the fee of a road opened under the English common law remained in the former owners of the property, the public acquiring a mere easement.

We are also satisfied, in answer to the defendant's second objection, that, by the partition agreement between the devisees of John Hopper the elder, John Hopper the younger became vested with the fee of the road adjacent to lot No. 6, which by the partition agreement was assigned to him as his share of the property.

The defendant also claims that the fee of the land was taken for the widening of Bloomingdale Road under chapter 61, p. 480, of the laws of 1787, and that the plaintiffs cannot, therefore, recover for the portion of Bloomingdale Road that was acquired under the provisions of this act. The question as to what interest would vest in the city or in the public, if a proceeding had been instituted under that act, the value of the land taken ascertained under it, and the amount thus ascertained paid to the owner, is not free from doubt. It is not necessary, however, that that question should be determined, as there is no evidence that any such proceeding was instituted or any such award made or paid to the owners of the land necessary for the widening of Bloomingdale Road. The only evidence we have is that in 1782, when the property of John Hopper the elder was apportioned among his devisees, a map filed for that partition showed Bloomingdale Road to be two rods wide, while by the Dougherty map, made in 1820, show-

ing the division of the property among the heirs of John Hopper the younger, the Bloomingdale Road appears to be four rods in width. Certain proceedings of the common council are referred to, by which Bloomingdale Road was ordered to be widened to its full width of four rods, and that a committee of the common council was appointed to open the road, and to confer with the proprietors of land on the subject; but there is no evidence that any proceedings were taken under this resolution, or that any award was made to the owners of the property taken to widen the road; and in Blackman v. Riley, 138 N. Y. 318, 34 N. E. 214, in speaking of these resolutions of the common council, the court said:

"The mere resolutions of the common council do not prove the fact that proceedings had been taken to acquire the title to lands which might be necessary for the purpose of widening a road. And if such proof had been given, we do not think it can be assumed, in the absence of evidence, that the committee appointed by the common council to see that the abutting owners moved their fences back performed that duty or exercised that power. * * * We cannot, in such a case, presume action of which there is not the slightest evidence."

We can find, therefore, no evidence to show that the city of New York ever acquired the title to the fee of any portion of Bloomingdale Road as shown to exist in the year 1820, of a width of four rods; and the presumption that in such a road the public had an easement, and the fee remained in the abutting owners, must control.

The next point insisted upon by the defendant is that under chapter 203, p. 196, of the Laws of 1847, the city acquired the fee of Bloomingdale Road. I do not agree with the referee that there was no evidence to show that the report of the commissioners in this proceeding was confirmed by the Supreme Court. On the contrary, I think the evidence quite conclusive that the report was confirmed, and that both the city and the property owners acted upon such confirmation. The evidence that upon the back of the report there was an indorsement, signed by the clerk of the Supreme Court, that the report was confirmed by the court, was in itself evidence of the action of the court confirming the report, and this, I think, would be sufficient, even without a formal order of confirmation; and the publication of the confirmation of the report, and the action of the city and the property owners both in imposing an assessment for the cost of the proceedings by the city, and the payment of awards by the city based upon such confirmation, were sufficient to require a finding that the report had been confirmed. Nor am I inclined to agree with the referee that the publication of the notice of the appointment of commissioners of estimate and appraisal, and the publication of the notice given by such commissioners appointed in said proceeding, was not sufficient to give the court jurisdiction. I think it clear, however, that the city acquired no title to the fee of Bloomingdale Road, for the reason that the report of the commissioners specifying the property taken in the proceeding for which an award was made does not specify the fee of the street as a portion of the property taken, nor was any award made for the fee of the street to the owners of the fee.

The act under which this question is presented is chapter 203, p. 196, of the Laws of 1847. It is entitled "An act to lay out a new street in

the Twelfth Ward of the city of New York, and to keep open a part of the Bloomingdale Road in said city." Section 1 of the act provides that "all that certain piece or parcel of land situate, lying and being in the Twelfth Ward of the city of New York and bounded and described as follows, that is to say." Then follows a description of a strip of land which includes the Bloomingdale Road as then existing, and the act then continues, "is hereby declared for all legal purposes to be one of the streets of the said city in like manner as if the same had been so laid out by the commissioners appointed in and by the act" passed April 3, 1807.

After the passage of this act a resolution was passed by the common council to open this road, and upon the petition of the city the Supreme Court appointed commissioners of estimate and assessment. In that petition it is alleged that the common council—

"Have deemed it advisable for the public convenience to open the Bloomingdale Road from the Seventh avenue to the Tenth avenue in the Twelfth Ward of the said city, the said Bloomingdale Road being a street in that part of the said city laid out into streets, avenues, squares or public places by the commissioners of streets and roads under and by virtue of an act of the Legislature of the people of the state of New York entitled 'An act relative to improvements touching the laying out of streets and roads in the city of New York and for other purposes,' passed April 3, A. D. 1807 [Laws 1807, c. 115], by taking for that purpose the lands and premises hereinafter described and removing therefrom the buildings situate and being thereupon, which said lands and premises are situated and bounded as follows, that is to say."

Then follows a description of the property as specifically described in the act of 1847. The petition further states that the petitioners "have accordingly ordered said Bloomingdale Road to be opened in manner aforesaid," and asks that, in accordance with the act of 1813, p. 409, c. 86, three commissioners of estimate and assessment be appointed for the purpose of performing the duties relative to the premises described in and by the said act mentioned.

On June 1, 1847, an order was entered appointing three commissioners in accordance with the prayer of this petition, and these commissioners filed their report on March 31, 1849. This report specifically describes by metes and bounds 122 parcels of land as the property to be taken for public use and for which awards are made, and there is annexed to this report a map which describes the property taken for the improvement. Upon this map Bloomingdale Road is laid out as an existing road. Parcel 27, for which an award was made, is a strip of land extending from Fifty-Second street to within a short distance of Fifty-Third street, one foot three inches in width on Fifty-Second street, and five feet in width upon the northerly side of the strip, which is described in the report as—

"Commencing at the point of intersection of the northerly line of Fifty-Second street and the easterly line of the present Bloomingdale Road as the same is now opened and used and running thence easterly along the said northerly line of Fifty-Second street one foot and three inches to the easterly line of the Bloomingdale Road as the same is to be opened; thence northerly along the said easterly line of the Bloomingdale Road as the same is to be opened, one hundred and seventy-two feet and two inches, to land of Isaac Fitz and John Johnson; thence westerly along the said last-mentioned land five feet to the easterly line of the present Bloomingdale Road as now opened and used, and thence southerly along the said easterly line of said Bloomingdale Road

aforesaid one hundred and seventy-three feet and six inches to the point or place of beginning."

And the commissioners further reported that Edward Sanford, trustee of John Hopper, deceased, "is seised in fee of, in, and to the last above described piece or parcel of land," and the commissioners awarded to Edward Sanford, as the owner of the said piece of land as described, the sum of $206. A similar piece of land is described on the westerly side of the present Bloomingdale Road, between Fifty-Second and Fifty-Third streets, by a description substantially the same in relation to the road, and for which an award of $584 was made. The report makes no mention of the ownership of the fee of Bloomingdale Road, and makes no award for the rights of the owners of the fee. I think that by this proceeding the public neither attempted to condemn the interests of the owners of the fee of the bed of the street, nor acquired title of such fee, and that therefore the devisees of John Hopper were not divested of their property in the road by the proceeding.

Article 1, § 6, of the Constitution of 1846, provided that no person shall be deprived of life, liberty, or property without due process of law, nor shall private property be taken for public use without compensation. The devisees of John Hopper the younger owned the fee of this street, subject to an easement in favor of the people of the state. This fee was protected by this provision of the Constitution, and neither the state nor the municipal corporation could take that property for public use without paying therefor. The report of the commissioners evidently assumed that the right of the city or the public to use this road was, as it then existed, sufficient for the purpose of carrying out the order of the Common Council opening this road, and no attempt was therefore made to acquire the fee. The commissioners did not assume to estimate the value of the fee owned by the devisees of John Hopper the younger, and made no award for its value, and the final confirmation of that report did not divest the owners of this property of their interest therein.

Nor do I think there was any adjudication in this proceeding that the city owned the fee; assuming that the proceedings were regular, and the owners of the fee were before the court. There was no such adjudication in the report or order confirming it. There is nothing that determines that the city owned the fee. There already existed a public easement to which the fee was subject, and whether the commissioners assumed that that easement was sufficient to carry out the purpose of the act, and the object of the city in opening the street, or assumed that the fee of this street then vested in the city, is entirely immaterial. If, as a matter of fact, these plaintiffs owned an interest in the fee of the street, they could not be divested thereof, except upon payment to them of its value.

When this report was presented to the court, and it was seen that the commissioners had made no attempt to determine the value of this property, the owners of the fee of the road had no reason to appear and object to that report, as their property in the street was not affected. Whatever they had before the proceeding was commenced they still had after the confirmation of the report, and their ownership of this property was therefore unaffected by the proceeding. If the commission-

ers had determined that the interest of the owners of the fee of this road, subject to the easement, was of merely nominal value, and had made a nominal award, and their report had been confirmed, then, of course, there would have been an adjudication as to the value of the interest of the owners of the fee which would have been binding upon the owners, and the fee would thereupon have vested in the city of New York. But in the absence of such a determination by the commissioners, by which the value of the interest of the plaintiffs or their predecessors in title in the specific property was ascertained, and an award made therefor, I can find no authority for saying that there was an adjudication that no one except the public had an interest in that property. If a proceeding was commenced to condemn a block of land for public use, and the commissioners left out of their report any reference to one specific lot included in that block, I do not imagine that it could be claimed that the confirmation of such a report was an adjudication that that particular lot was worth nothing, or that the city could get a title to it without paying its value. Before the property can be acquired by the city, it must pay its value, to be ascertained by the report of commissioners or the verdict of a jury. The pieces of property for which awards were made were bounded by the side of the existing road, and not by the road itself, so that by no construction can it be claimed that the award made for these abutting pieces of property did include the right of the abutting owner to the road itself. Nor was the payment of the award to the trustee the payment of an award made for the fee of the street; and thus the receipt by Edward Sanford, the trustee—assuming that a payment to him would have divested the plaintiff of the fee of the street if an award had been made for that fee—does not estop these plaintiffs from insisting that the award that was made and received was an award for the property abutting on the street which was taken for the opening of the street.

The next point relied upon by the defendant is that:

"Whatever may have been the actual legal effect of the proceedings taken in 1847 for the opening of Broadway, the city of New York has been in possession ever since under those proceedings, claiming that the street had been regularly opened under the act of 1813, and that it was entitled to a fee therein."

This position seems to be based upon the fact that the city had acquired by adverse possession the fee of the street, but there is not the slightest evidence that the claim of the city in the street down to the time that the street was closed, and the defendant's predecessors in title took possession of the property, was adverse to the plaintiff. It is conceded that there was an easement to which the fee of the Bloomingdale Road was subject, and the possession of the public continued after the proceedings based upon the act of 1847 as it had before existed. There is nothing to show that the city or the public claimed any other or greater right in this street after the confirmation of the proceedings taken under the act of 1847 than had before been exercised for many years.

The next objection taken by the defendant is that by the actual partition made in pursuance of a judgment of the Supreme Court entered in an action for that purpose on the 10th day of January, 1865, the right

of the plaintiffs to the fee of the road was divested. After the death of John Hopper the younger, in the year 1820, a proceeding was commenced in the Court of Common Pleas of the city of New York, called the "Mayor's Court," asking for a partition of the property; the petitioner in that proceeding being Ann Striker, one of the grandchildren of John Hopper the younger, and the defendants being the other grandchildren; the parties being the devisees of this property in question named in his will. Commissioners to partition the property were duly appointed, and it was determined that the rights of the parties "are as in the said petition set forth, and that partition be made." And the commissioners "did set apart, allow, and assign unto the said Ann Striker, the said plaintiff or petitioner, in severalty, for her part and share of the said premises, according to her right therein, as the same is ascertained and determined by the said court, all and singular the several lots, pieces, or parcels of land and premises, with the appurtenances thereto"; and then follows a particular description of the property set apart to Ann Striker. One of the pieces of property thus set apart to Ann Striker began at a point on Bloomingdale Road and land belonging to Cornelius Harsen, and running thence by metes and bounds back to the Bloomingdale Road, and thence along the said Bloomingdale Road 201 feet to the place of beginning—a description which would clearly include the fee of one-half of the Bloomingdale Road upon which this piece of land abutted; and this partition, if carried out, would have vested Ann Striker with the fee of Bloomingdale Road, which includes the premises in question. On the 15th of February, 1823, this report of the commissioners was confirmed by a final judgment. Annexed to this judgment was a map, which was introduced in evidence, showing the property set off to Ann Striker by this judgment. If this decree in partition had been valid, there can be no doubt but that Ann Striker would have acquired the fee of that portion of Bloomingdale Road, the title to which is included in the present action. And in April, 1821, the parties to the said action executed to each other releases of the shares or portions allotted to each in severalty. Under this decree of the Mayor's Court, the grandchildren entered into possession of the portions set apart to them in severalty until their death. Ann Striker died without issue in 1860, whereupon an action of ejectment was commenced in the Court of Common Pleas in the city of New York to recover a portion of the real estate of John Hopper the younger; the plaintiff claiming that he had acquired title to that portion of the property by virtue of a deed from the sheriff executed on a sale under execution and a judgment entered against Garrit H. Striker, one of the devisees under the will of John Hopper the younger. That case came before the Court of Appeals in Brewster v. Striker, 2 N. Y. 19. It was there held that, by the will of John Hopper the younger, the devise over was to the surviving grandchildren or grandchild on the death of those who should die without lawful issue then living; that the limitation over was valid as an executory devise, and that, as the three grandchildren were still living, Striker, under whom the plaintiff claimed, had no vested estate in the remainder or future estate in any part of the premises which could be sold under the judgment against him, or which could pass by a sheriff's deed to the purchaser; that the executors took

by implication the present legal estate in the premises as trustees, and that the grandchildren of the testator took no immediate legal estate which could pass by sale under the judgment; that the partition proceeding in the Court of Common Pleas was ineffectual to vest any legal title in either of the parties to the action, as the legal title vested in the trustees under the will.

Subsequent to this decision an action was commenced in which it was claimed that, on the death of Ann Striker without issue, the third part of the Hopper estate became vested in the surviving grandchildren of John Hopper the younger in fee simple, by virtue of the limitation over in the Hopper will. The executors and devisees of Ann Striker brought a cross-action, claiming that they took under the will a fee simple. The trustee brought another action to establish the trust of the Hopper will; he insisting that, by a proper construction of Hopper's will, the executors took a trust in all the shares until the death of the last survivor of the three grandchildren. These actions came before the Court of Appeals in Striker v. Mott, 28 N. Y. 82. Denio, J., in delivering the opinion of the court, states the question to be "whether Ann Striker was seised at the time of her death of an estate of inheritance in the premises in controversy." He then calls attention to the terms of the Hopper will, and to the partition action commenced in the Mayor's Court of the city of New York in October, 1820, the decree in that action, and the partition deeds executed between the respective parties, allotted in severalty to each of the devisees, and states that the Supreme Court had decided that Ann Striker had no estate in the premises of which John Hopper had died seised in her lifetime, and that, as to the judgment in partition and the partition deeds, their only effect was to adjust the share of the rents and profits to which the devisees would respectively be entitled during their lifetime, and that if, by their terms and legal effect, they would take a greater interest under the judgment and deeds, they ought to be deemed void in equity, and be vacated and annulled accordingly. The court then referred to the decision of the Court of Appeals in Brewster v. Striker as holding that the grandchildren took no immediate legal estate, the executors of John Hopper taking such an estate as trustee by implication. It was also held that the estate of the executors or trustees ceased, upon the death of Ann Striker, as to the one-third of the estate devised for her benefit; that the judgment in partition, and the deeds executed between the devisees of Hopper to carry that partition into effect, conveyed no present title or interest in the estate; that the executors were seised of an estate for life, and were entitled in equity to the rents and profits; that the deeds could not have any effect by way of release, because the grantors had no estate which it could operate to enlarge; and the Chief Judge concluded:

"Taking this will altogether, I understand the successive estates in each third part of the land to be limited as follows: First, to the trustees for the life of the grandchild for whose benefit that third was devised, remainder to the issue of that grandchild, if he or she shall have issue, in fee; but, if he or she shall die without issue living at his or her death (which last qualification results from the subsequent limitation to the survivor of the grandchildren), then remainder to the grandchildren and the survivor of them. Second. This second remainder is contingent, though it would have been

vested if the first remainder had been for any estate less than a fee simple. Hence Garrit H. Striker and Mrs. Mott had no estate which they could convey to Ann Striker by the deed under consideration, and hence, also, the devisees of the latter took nothing by the devise formally made in their favor."

Applying the principles established by these decisions, upon the death of Ann Striker without issue the surviving grandchildren became vested in fee simple with the undivided third of the property that had been held for Ann Striker during her life. Whereupon an action was brought in the Supreme Court for a partition of the property of John Hopper the younger. The premises abutting upon the portion of Bloomingdale Road in question were described as beginning at the corner formed by the intersection of the northerly line of Fifty-Second street with the easterly line of Broadway; thence northerly along the said easterly line of Broadway 177 feet and 9 inches to the land of several owners; thence in a southeasterly direction along said land of several owners to the westerly line of Seventh avenue; thence southerly along the westerly line of Seventh avenue to the northerly side of Fifty-Second street; thence westerly along the northerly line of Fifty-Second street 96 feet and 3 inches to the point or place of beginning—

"Together with all the right, interest, claim and demand whatsoever present or prospective vested or contingent of the owners of such last-mentioned tract, piece or parcel of land in the streets and avenues adjoining the same by reason of the beds of such streets and avenues or any part thereof having been taken pursuant to the statutes in that behalf made and provided from such owners to form such streets and avenues."

And the property upon the westerly side of Broadway opposite the premises described as set forth in the complaint was also described with a similar provision. The complaint contained the further provision that "the said plaintiff further shows that on the 28th day of November, 1820, a petition was presented by said Ann Striker, one of the devisees of the said will of said John Hopper, to the Court of Common Pleas for the city and county of New York, called the 'Mayor's Court,' praying for a partition of certain portions of the real estate devised in and by such will, and setting forth, among other things, that she the said Ann Striker was tenant in common of an equal, undivided third part of the premises named in said petition, which were the same lands, tenements, and hereditaments hereinbefore described"; that such proceedings were afterwards had upon such petition that commissioners were appointed to make partition of said premises, and did make such partition; that the said proceeding for partition in said Court of Common Pleas, and certain mutual simultaneously executed deeds of release thereupon executed between the said parties in interest, purport to allot and set off in severalty unto the said plaintiff Garrit H. Striker a certain portion of the said lands, tenements, and hereditaments described, and also to set off and allot in severalty to the defendant Winifred Mott another portion of the same, and unto the said Ann Striker, then deceased, another portion of the same; and that in any partition of the said lands, tenements, and hereditaments described, and so devised by said John Hopper, which may be adjudged or made in this action, it will be found convenient and agreeable to equity that the respective shares to be allotted and set off in severalty to the said Garrit H. Striker and the said Winifred Mott. respectively, shall be taken from

that portion of the same lands, tenements, and hereditaments described, and so devised as aforesaid, which were so set apart in severalty as aforesaid to said Ann Striker in the said former partition.

To this complaint there was no answer, and judgment in partition was entered on the 31st day of March, 1864. This judgment directs that partition be made of the lands and premises of which partition is demanded, so that the several parties whose proportionate shares in the whole are mentioned shall have and hold in severalty such parts and portions of the said lands and premises as shall be allotted and assigned to them, respectively, on such partition. These commissioners made their report on December 31, 1894, which recited that they had caused an accurate map to be made and had filed the same in the office of the register; that upon the said map these large parcels or blocks were divided into city lots with reference to the established streets of the city, and actual partitions of the property were made with reference to this map, a copy of which map was introduced in evidence. The lots on the east side of Broadway, between Fifty-Second and Fifty-Third streets, were designated by the numbers 76 to 82 on the map, and those on the west side, between Fifty-Second and Fifty-Third streets, by the numbers 83 to 89 on the map. The commissioners further reported that they had ascertained whether they might, consistently "with the rights of the parties and with justice and equity, make the partition of the said lands and premises conform to the respective occupations in severalty of one equal third part thereof enjoyed by the said Garrit H. Striker and by the said Ann Striker and by the said Winifred Mott, respectively; and we did therefore accordingly divide the whole premises into three principal divisions, one thereof being identical with the portion so occupied in severalty by the said Ann Striker, deceased, in her lifetime, and one other division identical with that portion so occupied in severalty by the said Winifred Mott, deceased, in her lifetime, and the said remaining division being identical with the portion so in the occupation in severalty of the said Garrit H. Striker." The commissioners then allotted to the said Garrit S. Mott, as one of the children of Winifred Mott, lots 79, 80, 81, and 82 on the easterly side of Broadway, and 86, 87, 88, 89, and 172 on the westerly side of Broadway; the lots on the easterly side of Broadway being described as follows:

"Also those four lots, pieces or parcels of ground situated in said Twenty-Second Ward of the city of New York designated on said map by Nos. 79, 80, 81, and 82, and together described and bounded as follows: Beginning at a point in the easterly side of Broadway distant 29 feet and 7 inches southwardly from the southerly side of Fifty-Third street, and running thence southwardly along said easterly side of Broadway 99 feet 10½ inches; thence easterly on a line parallel with said Fifty-Third street 115 feet 6½ inches to the west side of Seventh avenue; thence northwardly along said westerly side of Seventh avenue 77 feet and 5 inches to land of several owners; and thence northwestwardly along said lands of several owners 141 feet 6⅞ inches to said easterly side of Broadway, at the place of beginning."

This report was confirmed by a decree entered on the 10th day of January, 1865, by which it was adjudged and decreed—

"That the said hereinbefore described part or allotment of the said lands and premises allotted and assigned as aforesaid by the said commissioners to the said defendant Garrit Striker Mott as the part or share of the said lands and premises constituting his share of the said land and premises shall

be, and the same is hereby, vested in him, the said Garrit Striker Mott, in severalty, to be had, held, and enjoyed by him, his heirs and assigns, forever, separate and apart from the other parts of the said lands and premises."

I am inclined to think that under this decree the fee of the Bloomingdale Road was included with the abutting property. The partition proceeding in the Court of Common Pleas was based upon a construction of the will by which the land devised by John Hopper the younger was vested absolutely in his grandchildren, and in that proceeding there was set apart to each of the grandchildren a certain portion of the property in fee. The effect of that proceeding, if the construction of the will had been correct, would have vested in each of the grandchildren the fee of one-half of Bloomingdale Road, upon which the property assigned abutted. That partition suit having been based upon an incorrect construction of the will, and the effect of that partition being merely to assign the particular portions of the real property to which each grandchild was entitled during his life, the issue of the grandchildren having a vested remainder in their parents' share of the estate, one of the grandchildren having died, this partition suit was commenced in 1865 to have a final partition of the estate; and in the complaint it was asked that the several parts that had been set apart to each grandchild under the decree of partition in the Court of Common Pleas in the year 1820 should be set apart as the property to which the descendants of the grandchild should be entitled, and the interest in the abutting streets was described as a part of the property that had been set apart to the grandchildren, and of which partition was asked. The interlocutory judgment directed the commissioners appointed to make partition of the lands and premises of which partition is demanded, as follows:

"And in respect of the several portions of said lands and premises so occupied in severalty by the said Winifred Mott and Garrit H. Striker, respectively, it is declared, decreed, and adjudged to be just and equitable that, as far as may be found consistent with the rights of other parties, the partition hereinafter directed should be made to conform to such occupation in severalty, to the end that there may be allotted and assigned to the issue of said Winifred Mott, and the assigns, if any, of such issue, or of any of them, for that equal third part of the said lands and premises which so as aforesaid came to said sons of said Winifred Mott by the said devises to them respectively contained in the will of the said John Hopper the portion so occupied by the said Winifred Mott, or so much thereof as may be, and so that there may be allotted and assigned to the trustee under the said will, for his equal third part of the said lands and premises under said John Hopper's will the portion so occupied by the said Garrit H. Striker, or so much thereof as may be."

In pursuance of this direction in the decree, the commissioners reported that they had divided the whole premises, which included the interest in the street, into three divisions—one thereof being identical with the portion so occupied in severalty by the said Ann Striker, deceased, in her lifetime—and had allotted the portions so occupied by Winifred Mott, deceased, in her lifetime, to her children. The particular portions allotted to each child were then described by the map, and also by a particular description.

If the property had been awarded by simple reference to the map, it would have carried with it one-half of the Bloomingdale Road, upon which these lots abutted; and if there had been no reference to the map,

and the property that had been awarded was to be ascertained solely from the description, the fee of the Bloomingdale Road would have been excluded. The question then comes down to one of intention. Considering the situation—that the action was brought to partition all of the property in which these tenants in common were interested; that the complaint described the interest in the fee of the street, as well as the abutting property that was to be partitioned; that the commissioners were directed to partition the property of which partition was demanded, so far as could be to carry out the partition of 1820, which partition would have vested in the abutting owners the fee of the streets; and that the commissioners reported that they had complied with this direction, and, to carry that out, allotted these specific lots to Garrit S. Mott—I think we can find here an intention to include in the award of these lots one-half of the Bloomingdale Road, upon which the lots abutted. But when Garrit S. Mott came to convey this property, he adopted a description of the property that he then conveyed which excluded the fee of the street. It is true that the deed also referred, as a part of the description, to the number of lots upon the map upon which the division in the partition suit was made; but assuming that we could find from the existing situation at the time of the partition suit, and the object for which the partition suit was brought an intention to vest in Garrit S. Mott the fee of the street, there is nothing to show that when he subsequently conveyed these lots to Dudley Field, in March, 1865, he intended to include the fee of the street; and, as the plaintiffs are the successors in title of Garrit S. Mott, they would be entitled to at least the judgment that has been granted in this action.

In Potter v. Boyce, 73 App. Div. 383, 77 N. Y. Supp. 24, affirmed 176 N. Y. 551, 68 N. E. 1123, we based a conclusion that it was intended to include the fee of the street in a partition of property between tenants in common upon the intention of the parties, to be ascertained from the existing conditions, although the description, standing alone, without such evidence of intention, would be insufficient to convey the street. Applying that rule, it might be that, upon the division of this property in the partition action, such an intention could be ascertained and carried into effect; but, as before stated, there is nothing to show that, when Garrit S. Mott undertook to convey to Field, he intended to convey the fee of the street, when he adopted a description which by itself would exclude the fee. I do not think that a mere reference to the map is sufficient to show that the description which in express terms excluded any interest in the street was intended to include the street; and while the fact that the property was sold by a reference to the map would justify evidence of intention to include the interest in the street, and justify a finding, if such intention was established, that the fee of the street was included, I do not see, in the absence of evidence to show that such was the intention, that the court is justified in construing the grant to include the street, when the description of the property by metes and bounds expressly excludes it. Assuming, therefore, that we would be justified in holding that this judgment in partition actually did vest the fee of the street in Garrit S. Mott, there is nothing to show that he intended to transfer it to Field, through whom the defendant claims title.

There is one other point relied upon by the defendant, based upon chapter 890, p. 2236, of the Laws of 1869, relative to the widening of Broadway between Thirty-Fourth and Fifty-Ninth streets, which the defendant claims in some way divested the owners of the fee in the Bloomingdale Road, and vested it in him. This claim is based upon a provision of the act that:

"If any part or parts of Broadway shall be closed under the provisions of this act, any owner of land now fronting on Broadway, abutting on any part so closed, may acquire an exclusive right, title and interest of, in and to so much of any part so closed as lies between the present front line of the land owned by him, and the line of Broadway as it may be so as aforesaid located and established * * * upon paying to the chamberlain of the city of New York, for the mayor, aldermen and commonalty of the said city the amount of any award by the said commissioners of estimate and assessment, for the discontinuance of the public use of the land such owner is so entitled to acquire, and also paying to the said chamberlain, for the parties entitled thereto, the amount of any award by the said commissioners for the reversionary interest in such lands, or any part thereof; * * * but no award shall be made for the reversionary interest in case the parties having such interest shall be entitled to acquire the land."

It seems unnecessary to consider this provision as having the effect of divesting these plaintiffs of their interest in this property and transferring it to another without their consent. Whatever right the city of New York acquired by this statute to condemn property for public use, it certainly could acquire no right to condemn property for the private use of the owners of adjacent property. Neither the Legislature nor the city could divest the plaintiffs of their property in this street for any but a public use. These plaintiffs at the time of the passage of this act were the owners of the fee of a portion of Bloomingdale Road, subject to a public easement; and, when the public discontinued its use of the land constituting the road, the land belonged to the plaintiffs, discharged from the public easement to which it had before been subject.

I have now, as concisely as I could, stated the views that have forced me to the conclusion that the plaintiffs are, and the defendant is not, the owners of the fee of this strip of land forming a part of Bloomingdale Road, and the plaintiffs were therefore entitled to a judgment awarding them the possession of the property.

Upon the plaintiffs' appeal from the judgment, little need be said. The plaintiffs' predecessor in title granted to the defendant's predecessor in title this property abutting upon Bloomingdale Road, as an existing road. The plaintiffs' predecessor in title being the owners of the fee of Bloomingdale Road upon which this property abutted, there followed from the grant to the defendant's predecessor in title a right, which was appurtenant to the land granted, to use the grantors' interest in the Bloomingdale Road as a means of access to the property granted, and the plaintiffs' property in the road is clearly subject to that easement. When a person owning property abutting upon the road, and the road, whether public or private, conveys the abutting property to another, bounding it on the road, he subjects his interest in the road to an easement in favor of the property conveyed; and, without citing the authorities that have established that proposition, it is sufficient to say that it is the settled law of this state. Neither the act of 1869, nor chapter 1006, p. 2037, of the Laws of 1895, could appropriate this property

right vested in the plaintiff, and discharge the servient estate from the easement.

·It follows that the judgment appealed from must be affirmed, but, as both parties have appealed, it should be without costs.

VAN BRUNT, P. J., and O'BRIEN, J., concur.

HATCH, J. I concur in the views expressed by Mr. Justice IN-GRAHAM, in this case, save upon a single question; and, as that is a controlling one in the case, it necessarily involves a dissent from the conclusions reached by the court. The facts which this case presents are involved to the last degree. They have been admirably stated by Mr. Justice INGRAHAM in his learned and exhaustive opinion, and need not be further adverted to by me, except so far as it is necessary to express an opinion upon the particular question, the subject of disagreement.

It is undisputed that the act of 1847 made provision for acquiring title to the lands therein specifically described by metes and bounds. Of the lands so described, Bloomingdale Road formed a part. Pursuant to the provisions of this act, the city of New York instituted a proceeding to carry its terms into effect, and vest in the city title in fee to the lands thus described. The petition which instituted the proceeding described such lands in the same terms as were contained in the act. Having particular reference to the Bloomingdale Road, it stated:

"The said Bloomingdale Road being a street in that part of the said city laid out into streets, avenues, squares or public places by the commissioners of streets and roads under and by virtue of an act of the Legislature of the people of the state of New York, entitled 'An act relative to improvements touching the laying out of streets and roads in the city of New York and for other purposes,' passed April 3, A. D. 1807."

It appears, therefore, that not only was the proceeding instituted for the purpose of acquiring title to all the lands described in the act, and also in the petition, but that it was the clear and express claim made by the city in its petition that it had already acquired title to the land embraced within the Bloomingdale Road, and the authority was stated upon which it relied as the basis of the claim. By the provisions of the act of 1807, lands acquired by the city of New York thereunder for a public street vested in the municipality a title thereto in fee. It is evident, therefore, that, by the terms of the petition, notice of the claim of the city to be the owner of the fee of the land embraced within the Bloomingdale Road was expressly given to property owners and persons interested therein. There is no doubt but that Sanford, as trustee of John Hopper, deceased, who is claimed to have been the owner at this time not only of the strip of land which was taken upon the side of Bloomingdale Road, but also of the fee to the street itself, had notice of this proceeding, and of the claim thus made upon the part of the city. He was made a party to this proceeding, a substantial award was made to him for lands taken outside of the limits of the Bloomingdale Road, and the awards thus made were paid to and accepted by him. One of the issues, therefore, in that proceeding, raised by the petition, was the right and title of the city in and to the Bloomingdale Road, and it was

the issues thus raised which the commissioners subsequently appointed were called to pass upon and determine. As appears by the report made by the commissioners, they considered the subject of the owner-ship of Bloomingdale Road, and, as I construe their report, made an adjudication with respect thereto. Their report is addressed to the Supreme Court. They recite therein that they are commissioners of estimate and assessment, duly appointed—

"Relative to the opening of Bloomingdale Road from the Seventh avenue to the Tenth avenue, in the Twelfth Ward of the said city; the said Bloomingdale Road being a street in that part of the said city laid out into streets, avenues, squares, and public places by the commissioners of streets and roads under and by virtue of the act of the Legislature of the people of the state of New York entitled 'An act relative to improvements touching the laying out of streets and roads in the city of New York and for other purposes,' passed April 3, 1807."

The report then recites the taking of the oath by each of the commissioners, filing of the same in the clerk's office of the city and county of New York, and then states:

"And having viewed the lands and premises hereinafter mentioned and described, do hereby report to this honorable court that said Bloomingdale Road is a street in that part of the said city of New York laid out into streets, avenues, squares, and public places by the commissioners of streets and roads under and by virtue of the act of the Legislature of the people of the state of New York entitled 'An act relative to improvements touching the laying out of streets and roads in the city of New York and for other purposes,' passed the 3d day of April, in the year of our Lord 1807."

Then follows a description of 123 parcels of land for which awards of damages are made, the form being the same in each case; differing only in the names of owners, boundaries, and amounts.

It thus appears that not only was the issue raised before the commissioners with respect to the fee of the Bloomingdale Road, but that they viewed the land, and considered such question, and reported upon such subject. With respect to this matter their report is an adjudication of that question, is complete in its terms, and states the condition of the title, the force and effect of which is to determine that it belongs to the city of New York, as it was acquired by virtue of an act which vested title thereto in the city. That the commissioners made such adjudication is not only established by the determination as expressed in their report, but is clearly evident from all the other awards which they made. These awards were all for strips of land abutting upon the Bloomingdale Road, and it would necessarily follow, if the commissioners made no adjudication as to the title in Bloomingdale Road, that the proceeding which was confessedly instituted to take title to all these lands results in the acquirement of title by the city to the strips upon each side of the Bloomingdale Road, and leaves the fee of the road unaffected by the proceeding, and the title still in the abutting owner. The result of such a proceeding is so manifestly inconclusive as to be absurd. It would be a theme for ridicule, were it not so serious in its results. The existence of such a condition is so clearly at variance with the issues presented by the petition, and the necessary understanding of the parties affected by the proceeding, as to call for the rejection of such a construction of its effect, unless the adjudication be so faulty in its ex-

90 N.Y.S.—40

pression and determination as to admit of no other result. It is evident, however, that the commissioners themselves considered the issues thus presented, and they made in their report an intelligible adjudication upon the subject, for, whatever else may be said of it, it is at least understandable. The intention was to dispose of the issues, and the language of the report leaves no doubt but that the commissioners assumed to determine that the city was vested with the fee of Bloomingdale Road. Such adjudication having been made, and being clear and intelligible, and clearly within the issues they were required to determine, it became, when confirmed, a binding adjudication, having the force and effect of a judgment. It is so made by the express provisions of chapter 86, p. 342, of the Laws of 1813, as well as of the act of 1807, and is supported by authority. Matter of Opening Eleventh Avenue, 81 N. Y. 436; Matter of Commissioners of Central Park, 50 N. Y. 493; Spears v. The Mayor, 87 N. Y. 359; and many other cases.

I think that no distinction in principle can be made between Matter of Opening Eleventh Avenue, supra, and the present case. Therein the award which was made determined that the owners were only entitled to a nominal compensation, for the reason that such lands had been treated by the commissioners as dedicated to a public use. The court, on motion to confirm in that case, held that this conclusion of the commissioners was wrong, and therefore sent the case back to the commissioners to make a substantial award. Had the report making the award of nominal compensation been confirmed, it would have become a binding adjudication, even though it was, in effect, erroneous, in failing to award substantial damages. Here the report of the commissioners is an adjudication that the fee of the Bloomingdale Road was in the city of New York, and that report was confirmed. It is therefore a binding adjudication, unless a single element calls for a different conclusion. In Matter of Opening Eleventh Avenue, supra, there was an award made by the commissioners to the owners of a nominal sum, and this is the only distinction in principle between that case and the present. The prevailing opinion in the present case reaches the conclusion that such distinction is vital, by reason of a constitutional prohibition, and that therefore the report and confirmation are without validity. We have no quarrel with the constitutional provision that land appropriated in proceedings in invitum for a public use cannot be taken without compensation being made therefor, and proceedings seeking such result which fail to make an award where one is required are void. So far as I am aware, no such rule has been applied in a case where it appeared upon the face of the proceedings that such an award was not necessary when a question of title only was involved. Compensation follows title. In the present case the city of New York instituted proceedings to acquire title to lands, and the commissioners adjudicated that the municipality was the owner in fee of a part of the lands thus sought to be acquired. Manifestly, under such an adjudication, the award of damages to abutting owners having no interest was not required; and, as the city was the owner and taking the whole of the land required for the street, no award was necessary to be made to it. If the commissioners had awarded to the city of New York a nominal sum for the land, in connection with their adjudication, upon confirmation the title would

have become absolute, even though the adjudication as to ownership was erroneous. That would not invalidate it, within the authority to which we have called attention. It would seem that the constitutional provision has no application to such a case. All that is necessary to protect the rights of every person is adjudication of title, the making of awards, and payment. When lands of other owners are taken and paid for, the adjudication of its own title protects every right, and is as conclusive as though an award of damages had been made. It is evident that the commissioners, when they made their report, adjudicated that this land belonged to the city of New York, but made no award therefor because no award was required to protect the rights of the city; and the court, when it confirmed this report and this adjudication of title, clearly had the right to consider that no award in such case was necessary, as the adjudication, together with the awards which were made for lands taken in the proceeding from other owners, operated to complete a proceeding by and through which all of the land embraced within the proposed street became vested in the city of New York.

It may be conceded that it is somewhat anomalous for a municipality to institute proceedings to condemn lands for a municipal purpose which it owns at the time the proceeding is instituted. But in considering this subject we are to bear in mind that the Bloomingdale Road was at the time of the proceeding a public road, and used as such for public travel. So far as appears, there was no record in existence showing that in fact the title to this road had been acquired by the city by proceedings under the act of 1807, and yet the Legislature and the city were aware that such was the fact, and, in order to make a complete record of title, embraced it within the act and the proceeding, and thereby gave to all persons interested an opportunity to contest its claim if they had any valid right. It is also quite inferable that, as all of the land was to be acquired for a public street, it was deemed wise to embrace the road, in order that any claimed easements or other interests might be considered and finally adjudicated. Under such conditions it is easily seen that prudence would suggest that the land thus proposed to be devoted to a public use should have no flaw in its title. This anomaly fails in the face of such conditions. The proceeding and adjudication rested upon intelligent foresight. There was an issue and an adjudication of the city's rights, and such rights are to be established by an indisputable record.

Assuming that we are wrong in the above construction, when notices were given to the parties in interest of the confirmation of such report, and abutting owners were confronted with an adjudication that the city was the owner of the Bloomingdale Road, they were required to make objection to such report and adjudication, or be bound thereby. No objections were made, and the party in whom it is now claimed that the title vested to this part of the Bloomingdale Road affected by this action was a party to the proceeding, and received awards for lands taken therein. As, therefore, this question was within the issue presented by the proceedings, and the commissioners considered and reported upon such subject, in which they adjudicated that the title was in the city, such adjudication, as to all parties thereto, was final and conclusive; and, when confirmed, it operated as a judgment declaring the

fee of the Bloomingdale Road to be in the city of New York. If we are right in this conclusion, it is clear that the plaintiff has no title or interest in these premises.

It follows that the judgment should be reversed, and a new trial granted, with costs to the appellant to abide the event.

McLAUGHLIN, J., concurs.  VAN BRUNT, P. J., dissents.

---

(98 App. Div. 270)

## PEOPLE v. EBEL.

(Supreme Court, Appellate Division, Second Department.  November 18, 1904.)

1. GAMING—POOLROOMS—PROSECUTION—EVIDENCE.

   On a prosecution under Pen. Code, § 351, for receiving and recording money bet on a horse race, where the prosecutor testified that at the place where the offense occurred there were placards on the wall stating the names of the horses which were to compete in specified races, certain placards taken from defendant at the time of his arrest, containing what might be inferred to be the names of race horses, were not admissible against defendant, without proof that the cards were not used or to be used upon a race course, even if they were similar to the placards on the walls of the alleged poolroom, and were intended to be used in the registration of bets, of which there was no proof.

2. SAME—PREJUDICIAL ERROR.

   The court having charged that a few days after the offense defendant was arrested, and certain things found upon him were introduced in evidence, "because of the fact that he had denied having any connection with the poolroom," the admission of the placards in evidence could not be regarded as harmless error.

Appeal from Kings County Court.

William J. Ebel was convicted of receiving, registering, and recording money bet on the result of a horse race, in violation of Pen. Code, § 351, and he appeals.  Reversed.

Argued before HIRSCHBERG, P. J., and BARTLETT, WOODWARD, JENKS, and HOOKER, JJ.

Henry F. Cochrane, for appellant.
Robert H. Roy, Asst. Dist. Atty., for the People.

WILLARD BARTLETT, J.  There was an error in the admission of evidence upon the trial of this indictment which entitles the defendant to a reversal of the judgment.  The fourth count of the indictment, upon which the conviction is based, charged that on the 20th day of April, 1903, the defendant, in Kings county, and not upon any authorized race course, did feloniously receive, register, and record, and aid, assist, and abet in receiving, registering, and recording, the sum of $4, bet and wagered by one Albert Winters upon the result of a certain horse race thereafter to be run at St. Louis, in the state of Missouri.  The testimony given in support of this count tended to show that the defendant had committed the offense with which he was thus charged on the date stated in the indictment, to wit, the 20th day of April, 1903, at a poolroom at or near the corner of Harrison avenue and Bartlett